STATE OF WEST VIRGINIA *ex rel.* KEITH W. HALL,
DANIEL STRAIGHT, AND PAUL J. WHITTINGTON

*v.*

THE HONORABLE FRANK L. TAYLOR, *Judge of the Circuit Court
of Kanawha County, West Virginia,* AND JOHN D. ROCKEFELLER,
IV, *Secretary of State of the State of West Virginia and Sec-
retary of the State Building Commission of West Virginia*

(No. 12995)

Submitted October 6, 1970.    Decided December 15, 1970.

Rehearing Denied January 18, 1971.

*Leo Catsonis* and *John Sibray,* of counsel, for relators.

*Preiser, Greene, Hunt & Wilson, Stanley E. Preiser, L. Alvin Hunt,* for respondents.

CALHOUN, JUDGE:

This case involves a proceeding in prohibition instituted in this Court to prohibit further court action in eminent domain proceedings instituted in the Circuit Court of Kanawha County by The State Building Commission of West Virginia, which hereafter in this opinion may be referred to as the Building Commission or as the commission, for the purpose of acquiring fee simple title to certain real estate situated near the State Capitol in the City of Charleston, Kanawha County, for the further development of a master plan for the construction of public office buildings and related facilities to be used in connection with the State Capitol.

The relators in the prohibition proceeding, Keith W. Hall, Daniel Straight and Paul J. Whittington, are owners or lessees of certain lots or parcels of real estate located in the 1700 block of Washington Street, East, the property to which title is sought to be acquired in the eminent domain proceedings. The three relators also prosecute the prohibition proceeding as citizens, residents and taxpayers of the City of Charleston. See *Spilman v. City of Parkersburg,* 35 W.Va. 605, pt. 3 syl., 14 S.E. 279. The respondents in the prohibition proceeding are Honorable Frank L. Taylor, Judge of the Circuit Court of Kanawha County, and Honorable John D. Rockefeller, IV, Secretary of State, and, in that official capacity, ex officio Secretary of the Building Commission and a member thereof without "the right to vote upon matters before the commission."

The primary and basic question presented for decision is the constitutionality of Article 6 of Chapter 5, Code, 1931, as amended and reenacted in part by Chapter 10, Acts of the Legislature, Regular Session, 1968. The relators in the prohibition proceeding assert that the statute in question is unconstitutional in that it authorizes the issuance and sale by

the Building Commission of revenue bonds in such a manner as to be violative of Section 4 of Article X of the Constitution of West Virginia, which constitutional provision is as follows:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."

Portions of the statutory provisions involved in this case, prior to their amendment in 1966 and in 1968, were referred to in considerable detail in *State ex rel. State Building Commission v. Bailey*, 151 W.Va. 79, 150 S.E.2d 449. Hereafter in this opinion references will be made to the several sections of Article 6 of Chapter 5 of the Code as partially amended and reenacted in 1968.

Section 1 provides that the Building Commission shall continue "as a body corporate and as an agency" of the State of West Virginia; that it shall consist of the governor and four additional members to be appointed by the governor by and with the advice and consent of the state senate; that all members of the commission shall be paid or reimbursed for their necessary expenses but shall receive no other compensation, except that each member appointed by the governor shall receive, in addition to necessary expenses, a per diem of $35 for each day or substantial portion of a day that he is engaged in the work of the commission; and that such expenses and per diem shall be paid solely from funds provided for under the authority of Article 6, the constitutionality of which is involved in this case.

Section 3, dealing with the powers of the commission, provides that it may sue and be sued; that it shall have power to acquire in the name of the commission "or of the State," by purchase or otherwise, real property necessary or convenient for its corporate purposes and to exercise "the power of eminent domain" for such purposes; that it shall have power to make contracts and to execute all instruments necessary

or convenient to effectuate the intent of and the powers granted by the statute; that the commission shall have the power to construct a building or buildings on real property which it may acquire or which may be owned by the state in the City of Charleston, as convenient as may be to the "capitol building," together with incidental approaches, structures and facilities; and that it shall have the power to charge rentals for all or any part of a project or building at any time financed, constructed, acquired or improved, in whole or in part, with the proceeds of the sale of bonds issued pursuant to the statute.

Section 4 provides that all moneys of the commission, from whatever source, shall be paid to the state treasurer, to be deposited by him in a separate bank account or in separate bank accounts, and that the moneys in such account or accounts shall be impressed with and subject to the lien or liens thereon in favor of the holders of bonds issued and sold pursuant to the provisions of the statute.

By Section 7, the commission is empowered to finance the cost of a project "by the issuance of state building revenue bonds of the State, the principal of and interest on which bonds shall be payable solely from the special fund" provided for in the statute. This section provides that the bonds shall be authorized by resolution of the commission; that such bonds shall have all the qualities of negotiable instruments; that the commission may determine the form of the bonds and fix the denominations thereof; that the proceeds of the sale of the bonds shall be used solely for the payment of the cost of the project for which the bonds were issued; and that no bonds or other obligations shall be issued or incurred pursuant to the statute unless and until the legislature, by concurrent resolution, shall have approved the purpose and amount of each separate project.

Section 9 provides that the commission shall properly maintain, repair, operate, manage and control the project and fix the rates of rental.

Section 10 is as follows: "Nothing in this article contained shall be so construed or interpreted as to authorize or permit

the incurring of State debt of any kind or nature as contemplated by the provisions of the Constitution of the State of West Virginia in relation to State debt."

Section 11 is as follows: "It shall not be necessary to secure from any officer or board not named in this article any approval or consent, or any certificate or finding, or to hold an election, or to take any proceedings whatever, either for the construction of such project, or the improvement, maintenance, operation or repair thereof, or for the issuance of bonds hereunder, except such as are prescribed by this article or are required by the Constitution of the State."

Section 12 is as follows: "This article being necessary for the health, welfare and convenience of the citizens of the State, it should be liberally construed to effectuate the purposes thereof."

At the Regular Session, 1968, the Legislature adopted Senate Concurrent Resolution No. 38 which contains the following language:

"That the issuance of additional revenue bonds by the State Building Commission of West Virginia in an amount not to exceed seven million dollars is hereby approved by the Legislature, which amount, when added to the amount of eighteen million dollars heretofore authorized by House Concurrent Resolution No. 55, 1966 session of the Fifty-seventh Legislature, shall not exceed the total aggregate amount of twenty-five million dollars of revenue bonds, the proceeds of which shall be expended for the purpose of acquiring the necessary land for the construction of new office buildings and parking facilities, and for the purpose of constructing, equipping and furnishing same, in accordance with existing plans and specifications furnished to the former State Office Building Commission of West Virginia, designated as 'phase 2' in the 'State Capitol Master Plan, State of West Virginia,' January, 1966, prepared by Zando, Martin and Milstead, architects and engineers, and Boggs and Rehm, landscape architects and land planners; * * *."

Phase 2 of the State Capitol Master Plan, referred to in the joint resolution quoted immediately above, calls for the construction of buildings designated, respectively, as Number 5, 6 and 7. Number 7 is a relatively small structure which connects two large, multi-story office buildings, all of which are under construction and which, at the time of the decision of this case, have been almost completely constructed so as to be available for occupancy by various departments and agencies of state government.

In 1968, the exact date not being made clear from the record in this case, the Building Commission adopted a resolution by which it authorized the issuance of "Bonds of the State to be known as 'State Building Revenue Bonds, Series 1968'," in the principal amount of $24,200,000 for the purpose of acquiring real property upon which to construct the three state office buildings, previously referred to in this opinion, and incidental parking facilities in order to provide "additional essential office space and parking and other facilities for the administration of the affairs of the various departments, agencies and instrumentalities of the State." In relation to the estimated cost of the project, the resolution states: "* * * no part of which costs is expected by the Commission to be paid from any funds, grant or gift to be received from the United States of America or from any other source except the proceeds of sale of the Bonds."

By its resolution, the Building Commission covenanted with the bondholders that "the System" thereby authorized shall be for the use of the state or the agencies, boards and departments thereof; that buildings constructed will at all times be leased to the state or to "such agencies, boards and departments, or to the official of the State required by law to execute such leases in the name of the State, at rentals, commencing not later than April 1, 1970, sufficient to produce revenues equal to not less than 130% of the average annual principal and interest payments on the Bonds and 100% of the operating expenses of the System; * * *." The Building Commission's resolution further provides: "No lease or agreement for the use of the System or any of its facilities, shall pledge

the credit or taxing power of the State for the payment of the rentals or fees provided for in said leases or agreements."

The resolution prescribes the form and language of the bonds, including the following language:

"This Bond and the coupons appertaining hereto are payable solely from, and secured by a lien upon and pledge of the revenues derived from the operation and management of the Project and other properties constituting the State Building System established by the Resolution, and do not constitute an indebtedness of the State of West Virginia of any kind or nature as contemplated by the provisions of the Constitution of West Virginia in relation to State debt, and the State shall not be obligated to pay this Bond or the interest hereon except from the revenues of the System as provided in the Resolution. The credit or taxing power of the State shall not be deemed to be pledged to, nor shall a state tax ever be levied for, the payment of the principal of or interest on this Bond. * * *."

In conformity with the Building Commission's resolution, each bond contains the following language: "This Bond, together with the interest hereon, is exempt from taxation by the State of West Virginia or any county or municipality therein."

By contracts of lease dated April 1, 1970, the Building Commission, as lessor, leased to the State of West Virginia by the Commissioner of Finance and Administration, as lessee, for and on behalf of various departments and agencies of the state, office space in the office buildings, construction of which presently is nearing completion, at monthly rates of rentals as follows:

| | |
|---|---:|
| W. Va. Department of Highways | $ 104,254.34 |
| Department of Welfare | 40,098.71 |
| Department of Education | 28,252.45 |
| Division of Vocational Rehabilitation | 15,992.13 |
| Dept. of Finance & Administration | 15,016.73 |
| Department of Commerce | 10,595.97 |
| Civil Service Commission | 6,298.79 |

| Department of Labor | $ 3,601.92 |
|---|---|
| Teacher's Retirement Board | 2,587.20 |
| W. Va. Educational Broadcasting Authority | 1,402.75 |
| Public Employees Retirement System | 1,168.00 |
| Department of Banking | 1,036.62 |

In the answer of the respondents to the prohibition petition, it is admitted that the sum of $2,900,000 is the estimated annual rental of the system contemplated by the resolution of the Building Commission but that this estimated amount includes the amount estimated to be necessary for the operation and maintenance of the buildings which are being constructed.

The entire bond issue of $24,200,000 was purchased by Bache & Co., Incorporated, of New York City. The cost of the construction of the three office buildings previously mentioned is being financed from the proceeds of such sale of bonds. The bonds of the series mature annually beginning with the year 1972 and ending with the year 1993.

The lots or parcels of real estate involved in the eminent domain proceedings instituted in the Circuit Court of Kanawha County front upon the northern side of Washington Street, East, in the 1700 block thereof. Daniel Straight is the owner of one of such lots or parcels of real estate and Paul J. Whittington is the owner of another. Keith W. Hall is the sublessee of a building situated on one of the lots or parcels of real estate involved in the eminent domain proceedings. Each of the three persons named in this paragraph, Straight, Whittington and Hall, respectively, has been made a party defendant in one of the eminent domain proceedings instituted in the Circuit Court of Kanawha County pursuant to the provisions of Chapter 54, Code, 1931, as amended.

On July 21, 1970, this Court entered a vacation order by which it directed that a rule in prohibition be issued, directed against each of the two respondents in the prohibition proceeding, returnable on September 8, 1970, to show cause why a writ of prohibition should not be awarded pursuant to the prayer of the prohibition petition; and, by the same order,

further proceedings in the eminent domain proceedings were suspended pending the further order of this Court.

The case in this Court was continued to October 6, 1970, at which time it was submitted for decision upon the prohibition petition with exhibits; upon a demurrer and upon an answer with exhibits filed by the respondents in opposition to the prayer of the prohibition petition; upon a demurrer filed by the petitioners to the respondents' answer; and upon briefs and oral argument of counsel.

The pleadings present no disputed issue of any material fact. The basic question presented for decision, a question of law, is whether the revenue bonds authorized by the statute, and consequently issued and sold, constitute a debt of the State of West Virginia contracted in violation of Section 4 of Article X of the Constitution of West Virginia in view of the fact that rental payments to be used in retiring the bonds will be derived almost exclusively from moneys to be appropriated by the legislature to various state agencies and departments.

The petitioners in the prohibition proceeding assert additionally that the marketing of the bonds and the leasing of office space to the various departments and agencies of government, in the manner previously stated in this opinion, "unconstitutionally binds and compels future Legislatures of this State, * * * to provide by appropriation from the general revenues of this State", on an annual basis in each fiscal year, in order to defray the cost of paying the principal and interest of the bonds as they mature from year to year in the future. We believe this is but another way of stating that this "amounts to the creation of a debt inhibited by Section 4 of Article X of our State Constitution." *State ex rel. Dyer v. Sims,* 134 W.Va. 278, 294, 58 S.E.2d 766, 775.

We are of the opinion that this case is one of first impression in this Court. It may be helpful, therefore, to distinguish the Court's prior decisions of a related nature.

Counsel for the respondents insist that the question of constitutionality involved in the instant case was decided in

*State ex rel. State Building Commission v. Bailey,* 151 W.Va. 79, 150 S.E.2d 449. We do not agree with this contention. The *Bailey* case involved only the constitutionality of Section 1 of the statute as it then existed, in relation to the separation of powers provisions of Article V of the Constitution of West Virginia. The Court held that Section 1 was unconstitutional in this respect but that Section 1 was separable from other provisions of Article 6 and that, therefore, the constitutionality of such other provisions was not affected by the Court's decision. The question of constitutionality involved in the instant case was not raised, considered or decided in the *Bailey* case.

*Bates v. State Bridge Commission,* 109 W.Va. 186, 153 S.E. 305, involved the constitutionality of a statute which created the State Bridge Commission as a state agency and provided for the construction by it of bridges to constitute a part of the system of state highways. The statute further provided that construction of such bridges should be financed by the issuance and sale of revenue bonds to be paid wholly from tolls paid by members of the public using such bridges. The Court held that, inasmuch as the bonds were to be paid solely from tolls, no state debt was thereby created or incurred in violation of the constitutional provision involved in the instant case.

A similar decision was made in *State ex rel. State Road Commission v. O'Brien,* 140 W.Va. 114, 82 S.E.2d 903, which involved the issuance and sale of bonds for construction of a public highway bridge. The statute involved in that case, as in the *Bates* case, provided for payment of the bonds from funds arising from tolls; but, in the *O'Brien* case, the statute authorized the allocation and pledging of moneys in the State Road Fund as additional security for payment of the bonds.

A statute similar to that involved in the *Bates* case is Article 16A of Chapter 17, Code, 1931, as amended, which created The West Virginia Turnpike Commission and authorized it to issue revenue bonds for the construction and maintenance of turnpikes and to pay for such construction and maintenance by the issuance and sale of revenue bonds payable solely from tolls derived from the public use of such turnpikes.

In *Guaranty Trust Company v. West Virginia Turnpike Commission,* 144 W.Va. 266, 274, 107 S.E.2d 792, 797, the Court stated: "The Turnpike Commission was created and authorized to incur a bond indebtedness for the very reason that the State itself is prohibited by Article X, Section 4 of the State Constitution from incurring such indebtedness."

*State ex rel. The Board of Governors of West Virginia University v. O'Brien,* 142 W.Va. 88, 94 S.E.2d 446, involved the constitutionality of a statute formerly designated as Article 11A of Chapter 18, and now, in essentially the same language, appearing in Article 24 of Chapter 18, Code, 1931, as amended. The statute authorized the issuance and sale of revenue bonds to provide new buildings for West Virginia University and provided that the revenue bonds were to be paid solely from a special fund to be created or derived from specified fees collected from students attending the university. In support of the constitutionality of the statute, it was urged that the statute did not create a state debt in violation of the constitutional provision involved in the instant case because the bonds were payable out of a special fund not created by public taxation. In opposition to the contention of constitutionality, it was urged that a state debt was created in the circumstances, "especially since part of the revenues required to be paid into such special fund will be derived from income to be received from existing facilities belonging to the State, which revenues have heretofore been applied to the maintenance or operation of the university." It was further contended "that the requirement of the payment of such funds into the special fund will, of necessity, require additional revenues to be raised by taxation for the purposes of maintaining and operating the university." *State ex rel. The Board of Governors of West Virginia University v. O'Brien,* 142 W.Va. 88, 92, 94 S.E.2d 446, 449. In that case, as well as in *State ex rel. State Road Commission v. O'Brien,* 140 W.Va. 114, 82 S.E.2d 903, in upholding the constitutionality of the statute in question, the Court referred to the so-called "special fund doctrine" as stated in 49 AM. JUR., *States, Territories, and Dependencies,* Section 67, page 280, to which further reference will be made hereinafter in this opinion. For a discussion of the two *O'Brien*

cases referred to immediately above, see 59 W. Va. L. Rev. 206.

In various situations it has been held that the issuance of self-liquidating bonds did not constitute a "debt" of a county or municipality in violation of Section 8 of Article X of the Constitution of West Virginia. *State ex rel. County Court of Marion County v. Demus*, 148 W.Va. 398, 135 S.E.2d 352; *Casto v. Town of Ripley*, 114 W.Va. 668, 173 S.E. 886; *Brewer v. City of Point Pleasant*, 114 W.Va. 572, 172 S.E. 717. For a discussion of the *Demus* case, see 67 W. Va. L. Rev. 228. *Warden v. City of Grafton*, 115 W.Va. 438, 176 S.E. 706, involved a situation in which the city issued revenue bonds to construct a hospital and pledged, in addition to the net revenues to be derived from the operation of the hospital, the sum of $5,000 annually from the general revenues of the municipality, other than taxes levied directly on real estate and personal property. The decision of the Court was summarized in the syllabus of the case as follows: "Any attempt of a municipality to obligate itself to pay a debt from indirect taxes to be collected in future years is in violation of Constitution, Article X, section 8."

In support of the contention of constitutionality, counsel for the respondents in this case rely upon the fact that it is expressly provided by Section 10 of the statute that the provisions of Article 6 shall not be so construed or interpreted as to authorize or to permit the incurring of state debt of any kind or nature and that the principal and interest of the bonds may be paid only from the fund created by the statute. A similar provision is included in the resolution of the commission which provided for issuance and sale of the bonds. Each bond also contains a similar provision. In this connection, counsel for the respondents urge that the statute is not unconstitutional for the reason that its provisions form the basis of a legal proposition which is referred to as the "special fund doctrine". That legal proposition is summarized in 49 Am. Jur., *States, Territories, and Dependencies*, Section 67, page 280, as follows:

> "Although the cases are not entirely in accord and dissenting opinions have been frequent, it has

generally been held that an obligation payable from a special fund created by the imposition of fees, penalties, *or excise taxes,* and for the payment of which the general credit of the state is not pledged and resort may not be had to property taxation, is not a debt within the meaning of constitutional debt limitations. *Such a limitation applies solely to that arising from a general levy and not excise taxes."* (Italics supplied.)

For additional discussions of the "special fund doctrine", see *State ex rel. Meyer v. Steen,* 183 Neb. 297, 160 N.W.2d 164; *Button v. Day,* 204 Va. 270, 130 S.E.2d 459; *State v. Martin,* 62 Wash. 2d 645, 384 P.2d 833; 53 MICH. L. REV. 439; 68 YALE L.J. 234; Annot., 100 A.L.R. 900; 81 C.J.S., *States,* Section 151, page 1187.

The quotation appearing immediately above was referred to in *State ex rel. State Road Commission v. O'Brien,* 140 W.Va. 114, 118, 82 S.E.2d 903, 905. Constitutionality was upheld in that case on the ground that the State Road Fund, which was secondarily pledged as security for payment of the bonds, is a "constitutional fund" and hence the general revenues of the state were not obligated in such a manner as to create a state debt in violation of the constitutional provision involved in this case. The Court did not consider itself required to adopt or to reject the special fund doctrine. *State ex rel. State Road Commission v. O'Brien,* 140 W.Va. 114, 123, 82 S.E.2d 903, 907-08.

In *State ex rel. The Board of Governors of West Virginia University v. O'Brien,* 142 W.Va. 88, 95, 94 S.E.2d 446, 450, the Court again referred to and quoted the statement of the "special fund doctrine" as previously quoted in this opinion. The Court thereupon proceeded to state: "Our cases are in complete accord." This statement seems to imply merely that prior decisions of the Court are consistent with the special fund doctrine.

Four of the five members of the Court are of the opinion that the statute in question is unconstitutional in part; that the Circuit Court of Kanawha County, though admittedly

having jurisdiction in eminent domain, is exceeding its legitimate powers in entertaining the eminent domain proceedings in the light of the unconstitutionality of the statute; and that, therefore, the writ of prohibition as prayed for should be awarded. *State ex rel. Battle v. Hereford*, 148 W.Va. 97, 133 S.E.2d 86. The writer of this opinion disagrees with this portion of the Court's decision and, with the approval of the other members of the Court, he will append to the latter portion of this opinion a statement of the basis of his disagreement and dissent. While this procedure is somewhat unusual, it is not lacking in precedents among prior decisions of this Court. *Piper v. Miller*, 154 W.Va. 178, 173 S.E.2d 662; *United Fuel Gas Company v. Battle*, 153 W.Va. 222, 167 S.E.2d 890.

Admittedly the statute involved in this case contemplates that the bonds are to be paid from a fund to be created and maintained by rent to be paid by the various agencies and departments of the state government; and admittedly it is contemplated by the statute that the rent will be paid from general revenue funds to be appropriated by the legislature to the various agencies and departments of the state government from year to year. Apparently it is agreed by counsel for the respective parties that, in a situation such as that involved in this case, there is a division of authority on the question whether a state debt is unconstitutionally created by the statute.

It is difficult to state the "separate fund doctrine" precisely. Its application varies somewhat among appellate courts of various states. It is applied uniformly in relation to projects or facilities which are self-liquidating, such as the toll bridge cases. Some courts hold that the doctrine applies in any case of a fund created by a special excise tax as distinguished from property taxes. Other courts hold that the doctrine cannot be lawfully applied to a fund created by a special excise tax. It seems to be uniformly held, however, that the doctrine cannot be applied to a fund which is created and maintained, in whole or in part, by general tax revenues, for the reason that such would clearly violate the purpose and intent of constitutional provisions such as that involved in this case. The basic intent and purpose of such constitutional provisions is to

prohibit any legislative act which would bind subsequent legislatures to make appropriations of moneys in subsequent fiscal years. Similar restrictions are placed on local fiscal bodies by Code, 1931, 11-8-26 and by Section 8 of Article X of the Constitution of West Virginia. See *Edwards v. Hylbert,* 146 W.Va. 1, 18-19, 118 S.E.2d 347, 356-57.

The statute involved in this case does not contemplate a special fund to be created and maintained either by a special excise tax or by a self-liquidating facility such, for instance, as a toll bridge. The "special fund doctrine", therefore, is not applicable to the present case. In these circumstances, we are brought directly to a decision whether the statute in question creates a state debt in contravention of Section 4 of Article X of the Constitution of West Virginia.

The Court is of the opinion that the statute involved in this case evidences a patent legislative purpose to circumvent the salutory provisions of Section 4 of Article X of the Constitution of West Virginia and that, if the statute is held in this case to be constitutional, such legislative purpose will have been effectually consummated.

We are, of course, fully mindful of the duty of a court to uphold the constitutionality of a legislative enactment as such duty has been recognized and reiterated in numerous prior decisions of this Court, including *State ex rel. Metz v. Bailey,* 152 W.Va. 53, 159 S.E.2d 673; *State ex rel. Appalachian Power Company v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351; and *Bates v. State Bridge Commission,* 109 W.Va. 186, 153 S.E. 305. On the other hand, a court is bound by an equally imperative duty to declare a legislative enactment to be invalid if it is clearly unconstitutional. *State ex rel. Smith v. Kelly,* 149 W.Va. 381, 141 S.E.2d 142; *Nuckols v. Athey,* 149 W.Va. 40, 138 S.E.2d 344.

It is the duty of the Court in this case to consider the substance of the plan envisioned by the statute in determining the question of constitutionality. *Gould v. Greylock Reservation Commission,* 350 Mass. 410, 425, 215 N.E.2d 114, 125. If the ultimate effect of the statute, when considered in its

entirety, would be to create a state debt in violation of the constitutional provision in question, our duty is to declare that, in this respect, the statute is invalid. A mere legislative declaration that a state debt is not created by the statute is not conclusive or binding upon a court. Whether a state debt is created by the statute is a judicial question, rather than a legislative question. *People ex rel. City of Chicago v. Barrett,* 373 Ill. 393, 26 N.E.2d 478; *State Office Building Commission v. Trujillo,* 46 N.M. 29, 54, 120 P.2d 434, 449; *Boswell v. State,* 181 Okla. 435, 437, 74 P.2d 940, 943. "A declaration in an act that the debt thereby created is not the debt of the state is without effect where it is clear from the terms of the act that it is the debt of the state." 81 C.J.S., *States,* Section 149 at page 1184.

It is an exercise in fiction, semantics, sophistry or circumlocution, devoid of substance, to assert that the statute in question does not create a state debt. It is a debt which, in the contemplation of the statute, must necessarily be paid in annual installments over a period of years and by successive legislatures from fiscal year to fiscal year. The state is legally obligated to furnish office space and to pay other expenses incidental to the continued existence and functioning of the various state agencies and departments which have rented office space in the buildings in question. The legislature is legally obligated to make appropriations from time to time to defray the costs of such essential governmental operations.

The statute clearly contemplates that the state agencies and departments will occupy the buildings as renters of office space therein for a period of indefinite duration. The net effect, therefore, is that the statute effectually obligates successive legislatures, over a period of years in the future, to pay rent at specified annual rates.

For reasons stated, the Court holds that, to the extent that Article 6 of Chapter 5, Code, 1931, as amended, authorizes the issuance and sale of revenue bonds for the construction of state office buildings and contemplates that the principal of and interest on the bonds shall be paid from a fund to be

created and maintained primarily from general revenue appropriations by the legislature from year to year as rent for occupancy of such buildings by various state agencies and departments as lessees of office space in the buildings so constructed, a state debt is thereby created in violation of Section 4 of Article X of the Constitution of West Virginia, and, therefore, in this respect and to this extent, the statute is unconstitutional and void. The legislature, therefore, has unconstitutionally undertaken to provide for the creation of a "fund" from which the revenue bonds may be paid.

Unlike *State ex rel. State Building Commission v. Bailey,* 151 W.Va. 79, 150 S.E.2d 449, the present case does not permit the isolation of a single section of the statute which alone may be regarded as unconstitutional and separable from the remainder of the statute. Here the question of constitutionality involves the basic question whether the statute in its entirety creates a state debt in violation of the constitutional provision in question. The Court decides that question in the affirmative. That is the only basic question presented for decision in this case.

The Court merely holds that the ultimate effect of the statute, when considered in its entirety, is to create a state debt in violation of the constitutional provision in question.

It is clear from prior decisions of this Court, including the *State Building Commission* case, the two *O'Brien* cases, the *West Virginia Turnpike Commission* case and the toll bridge cases, all previously referred to in this opinion, that the legislature may lawfully create an agency or body, such as the State Building Commission of West Virginia; and that it may clothe such a body with authority to construct and to maintain a state facility and to issue and sell revenue bonds for the purpose of constructing and maintaining the state facility authorized by the legislature. In no such legislation, however, may the legislature create a state debt in violation of the provisions of Section 4 of Article X of the Constitution of West Virginia.

If the statute in question which provides for the revenue bonds to be paid from general revenue is held constitutional,

there would never be any need for general obligation bonds to be voted on by the people for any purpose.

This Court has never held valid any act of the legislature authorizing the issuance and sale of bonds, whether they be termed "revenue" bonds or otherwise, where the principal and the interest of such bonds are to be paid from year to year from the general revenue funds of the state. It is the view of this Court that the legislature has no such authority, and that, if a building complex were to be created involving scores of millions of dollars, it was the duty of the legislature to adopt a resolution placing that question upon the ballot for determination by the people of this state in the same manner in which road bonds are voted upon. Although the bonds in question are designated as "revenue" bonds, the term "revenue" bonds means that, over a period of twenty or more years, the principal and interest of the bonds are paid from sources other than the taxes of the people of this state which go into the general revenue fund. However, it is clear from the provisions of the statute, the bond resolution and the bonds that the bonds are to be retired by sums of money to be paid in the form of rent by various state agencies and departments which occupy the buildings. For example, nearly $105,000 a month is to be paid for rent by the Department of Highways and smaller amounts are to be paid by other agencies.

It is no answer to the invalidity of this statute and of the action of the Building Commission in issuing these bonds to say that some future legislature is not *required* to make an appropriation to one of these agencies or departments in order that the agency or department might make its payment of rent. The failure to make such an appropriation could result in the holders of the bonds taking over the buildings involved, and it is incomprehensible that any legislature would permit any such thing to happen. However, the test is not whether a future legislature is required to make such appropriations. The test is the authority to do so. Clearly the only source of income by which the bonds may be liquidated is the rent to be paid by the occupants of the buildings. Therefore, the reason for the invalidity of the statute lies in the *authority* of the legislature to make such future appropriations. It is not

necessary for this Court to wait until some future legislature refuses to make an appropriation to make a determination of the legality of this procedure.

If by this decision this state may be embarrassed financially, it is not the fault of this Court. The parties knew or should have known that this was a questionable procedure, and the matter of the validity of these bonds and the question of whether they were general obligation bonds or revenue bonds could have been tested in a proper proceeding in a court of competent jurisdiction before the Building Commission proceeded to the point where admittedly chaos may result because of the decision of this Court in this case.

The Court does not assert that each of the cases cited hereafter in this opinion is a precise precedent for the Court's decision in this case. Indeed, some of them are perhaps plausibly distinguishable from the present case. We are of the opinion, however, that all the following authorities contain helpful discussions of the constitutional question presented in this case and that, considered in their entirety, they sustain the soundness of the Court's decision: *Rosemont Building Supply, Inc. v. Illinois Highway Trust Authority*, 45 Ill. 2d 243, 258 N.E.2d 569; *People ex rel. Greening v. Green*, 382 Ill. 577, 47 N.E.2d 465; *Curlin v. Wetherby*, (Ky.), 275 S.W.2d 934; *Opinion of the Justices*, 146 Me. 183, 79 A.2d 753; *Gould v. Greylock Reservation Commission*, 350 Mass. 410, 215 N.E.2d 114; *State ex rel. Meyer v. Steen*, 183 Neb. 297, 160 N.W.2d 164; *State ex rel. Nevada Building Authority v. Hancock*, (Nev.), 468 P.2d 333; *McCutcheon v. State Building Authority*, 13 N.J. 46, 97 A.2d 663; *State Office Building Commission v. Trujillo*, 46 N.M. 29, 120 P.2d 434; *State ex rel. Public Institutional Building Authority v. Griffith*, 135 Ohio St. 604, 22 N.E.2d 200; *State ex rel. Washington State Finance Committee v. Martin*, 62 Wash. 2d 645, 384 P.2d 833; *State ex rel. Washington State Building Financing Authority v. Yelle*, 47 Wash. 2d 705, 289 P.2d 355; *State ex rel. State Capitol Commission v. Lister*, 91 Wash. 9, 156 P. 858; 68 Yale L.J. 234; 53 Mich. L. Rev. 439.

The respondents' authorities seem to admit that this method of financing is at least questionable. They reason, however, that such method is necessary to provide for the acquisition of needed improvements. They would take the matter of financing needed projects out of the hands of the electorate. We believe this is neither advisable nor desirable. We cannot permit the exigency of a situation to override constitutional safeguards.

The writer of the Court's opinion respectfully dissents. His dissent relates basically to the portion of the Court's opinion which holds that the statute is, in part, unconstitutional. Incidentally, however, he is troubled by the ease with which the Court applies prohibition to the facts of this case.

Circuit courts are constitutional courts of general jurisdiction. Doubtless they are the most important courts in the judicial system of the state.

By reason of Code, 1931, 54-2-1, circuit courts have exclusive original jurisdiction in eminent domain. The eminent domain proceedings have been instituted in the trial court in this case pursuant to and in complete conformity with the provisions of Article 2 of Chapter 54, Code, 1931, as amended, which prescribe the procedure to be followed in eminent domain cases. The question of constitutionality in this case does not, in any sense, relate to or affect the statutes prescribing circuit court jurisdiction or procedure in eminent domain cases.

The record discloses that the only proceedings had in the circuit court consisted of the entry of orders filing the eminent domain petitions and ordering the serving of notices to parties defendant in such proceedings pursuant to the requirement of Code, 1931, 54-2-3, as amended. The circuit court has as much jurisdiction as this Court to decide the question of its jurisdiction and powers and, incidentally, to decide the constitutionality of the statute in question in this case. There is, therefore, no legal basis for departing in this case from fundamental, time-honored principles which are summarized in the following quotations:

"The extraordinary remedy of prohibition is not available to prevent proceeding in a law action pending in a court which has jurisdiction of the subject matter and of the parties litigant, and there is no clear showing that such court has exceeded its legitimate powers." *Sidney C. Smith Corporation v. Dailey,* 136 W.Va. 380, syl., 67 S.E.2d 523.

"Prohibition will not lie to prohibit an inferior court from entertaining a cause, if it has jurisdiction of cases of the same general nature and is not abusing such jurisdiction by exceeding its legitimate powers." *County Court v. Boreman,* 34 W.Va. 362, syl., 12 S.E. 490.

It may be asserted with some justification that the course pursued by the legislature in enacting the statute involved in this case is unwise, injudicious or inexpedient, and that to uphold constitutionality in this case may set a dangerous precedent for future issuance of revenue bonds for the construction and maintenance of various sorts of public facilities throughout the state. Courts have no right, however, to concern themselves with questions relating to the wisdom, policy or expediency of a legislative enactment. *State ex rel. Metz v. Bailey,* 152 W.Va. 53, pt. 3 syl., 159 S.E.2d 673; *Farley v. Graney,* 146 W.Va. 22, pt. 7 syl., 119 S.E.2d 833.

Perhaps no provision of the Constitution of West Virginia imposes a more important restraint and obligation on this Court than the "separation of powers" provision of Section 1 of Article V which is, in part, as follows: "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; * * *."

This Court has recognized time and again its solemn duty to seek to uphold constitutionality of legislative enactments and the strict limitations upon its constitutional authority to declare any legislative enactment to be violative of any constitutional provision. Some of these principles so frequently reiterated by the Court were summarized in the first point of the syllabus of *State ex rel. Appalachian Power Company v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351, as follows:

> "In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt."

Apparently the enactment of the statute involved in this case was on a nonpolitical and nonpartisan basis. The plan envisioned by the statute not only has the sanction of the legislature, but apparently it has enjoyed additionally the general sanction and approval of persons in authority in the executive department of state government.

There is no suggestion that the statute was enacted surreptitiously or as a consequence of any corrupt, dishonest or otherwise improper motives. On the contrary, the statute obviously was enacted for quite laudable reasons, in view of the common knowledge that the state has been paying annually enormous sums of money as rent of office space from private lessors in the City of Charleston because of the gross inadequacy of office space in the State Capitol buildings to accommodate various departments and agencies of state government.

It is not for this Court to question the wisdom, policy or expediency of official actions taken by either of the other two branches of state government to the extent that, actuated and motivated by unquestionable integrity and good faith, they have devised and substantially completed a plan to alleviate and happily to remedy an extremely critical problem faced by persons in authority in the legislative and the executive branches of the state government.

No answer to the constitutional question is furnished by an assertion that the statute here in question represents a

subterfuge or a scheme to avoid the inhibitory provision of Section 4 of Article X of the Constitution of West Virginia. Contentions of this nature quite generally have been regarded as unsound from a legal standpoint. The following statement appears in *Loomis v. Callahan*, 196 Wis. 518, 524, 220 N.W. 816, 818:

> "It is of no legal consequence to say that the plan is a subterfuge and devised for the mere purpose of circumventing the constitution. That may be admitted without answering the question thus presented one way or the other. In order to condemn the transaction, it must be found that it creates a state debt within the meaning of the Constitution. Even though any plan which places needed buildings at the disposal of the state may be said to circumvene the Constitution, it does not offend against the Constitution, unless the plan does give rise to a state debt within the meaning of the Constitution."

A similar statement appears in *Clayton v. Kervick*, 52 N.J. 138, 151, 244 A.2d 281, 288, as follows: "Nor was there any reason for viewing the plan as illegal evasion rather than a form of legal avoidance, common in diverse fields of law." The same legal proposition was stated in *Book v. State Office Building Commission*, 238 Ind. 120, 149-50, 149 N.E.2d 273, 288, as follows:

> "Appellant further asserts in this connection that the State Office Building Act, the resolution of the Commission passed pursuant thereto, and the use and occupancy agreements, are 'an attempt to avoid the constitutional debt limitation and cannot be countenanced.' It is never an illegal evasion of a constitutional provision or prohibition to accomplish a desired result, which is lawful in itself, by discovering or following a legal way to do it. Kelley v. Earle, supra, 1937, 325 Pa. 337, 351, 190 A. 140, 147; State ex rel. Thompson v. Giessel, supra, 1955, 271 Wis. 15, 42, 72 N.W.2d 577, 591."

It is doubtless true beyond peradventure that the drafting and the enactment of the statute involved in this case represented a deliberate, carefully studied effort to provide needed office space for the benefit of departments and agencies of

state government in such a manner as not to be violative of the constitutional provision involved in this case. No doubt the same may be said of statutes involved in virtually all of the numerous court decisions from throughout the land which have been cited and relied upon by counsel for the respective parties in this case. Indeed, it is perhaps true that scarcely a day passes during a legislative session in this or any other state during which the legislators are not engaged in efforts to draft and to enact needed legislation in such a manner that it will not conflict with some constitutional provision. There is nothing inherently insidious or evil about such legislative purposes. On the contrary, they are both legitimate and commendable.

The statute involved in this case was skillfully drafted in order to avoid the creation of a state debt in violation of the constitutional provision. It is reasonable to assume that the draftsman or draftsmen of the statute had the benefit of the numerous prior court decisions of cases of this general nature in other states. Many of the pitfalls or imperfections which have resulted in adjudications of unconstitutionality in other cases, therefore, have been avoided in the drafting and enactment of the statute involved in this case. It is difficult, in such circumstances, to determine with complete assurance that any prior court decision from any state is a precise, conclusive precedent for an adjudication of unconstitutionality of the statute involved in this case.

If the statute in this case creates a state debt in violation of the pertinent constitutional provision, it follows that the state, through its legislative and executive branches, has unconstitutionally created debts in innumerable instances in the past in the normal operation of state government. The same applies to local fiscal bodies which are inhibited by constitutional and statutory provisions from encumbering future levies, as discussed in *Edwards v. Hylbert*, 146 W.Va. 1, 18, 118 S.E.2d 347, 356.

The state and its political subdivisions necessarily make many contracts which are contemplated to extend over a period of years, requiring periodic payments of money for such

items as rent and public utility services. Such contracts are valid for the reason that the payments, the "debts", mature periodically in the future. Debts in such categories are created from fiscal year to fiscal year with the result that no "debt" thus incurred in any fiscal year encumbers the budget of a local levying body for a future fiscal year; and no debt thus incurred by the state requires a legislative appropriation to be made in a future fiscal year for payment thereof.

The following statement appears in *Clayton v. Kervick*, 52 N.J. 138, 150, 244 A.2d 281, 287: "The common law did not recognize future rents as present debts or liabilities and the holdings in most of the cases throughout the country dealing with debt limitation clauses are to the same effect." That statement is followed by citation in the opinion of approximately fourteen court decisions, including a decision of the Supreme Court of the United States. To the same effect, see *Application of Oklahoma Capitol Improvement Authority*, (Okla.), 355 P.2d 1028.

In *State ex rel. Dyer v. Sims*, 134 W.Va. 278, 290, 58 S.E.2d 766, 773, the Court made the following statement:

"The provisions of Section 4 of Article X, aforesaid, raises a more serious question. In effect, it provides that no debt shall be contracted by the State except to meet casual deficits and other specified situations. Ordinarily, the creation of a State board or commission which requires an appropriation of public funds to carry out its purposes is not treated as the creation of a debt, although its generally contemplated continuation from year to year, and for an indefinite period, must necessarily involve future appropriations. Practically all agencies created by the Legislature require appropriations from time to time, and that was necessarily contemplated at the time they were created."

Each lease provides that it shall continue "from fiscal year to fiscal year" and that it shall be "considered renewed for each ensuing fiscal year during the term of the lease unless it is terminated or modified by agreement of both the Lessor and Lessee." The lease further provides that rent shall be

*"payable on the first day of every month for the preceding month* during the term of this lease, again subject to availability of funds." (Italics supplied.) The lease contains the following additional provision:

"(6) It is further covenanted and agreed by and between the parties hereto that this lease *shall be considered canceled,* without further obligation on the part of the Lessee, *if the State Legislature* or the Federal Government *should subsequently fail to appropriate sufficient funds therefor, or should otherwise act to impair the lease or cause it to be canceled."* (Italics supplied.)

Section 7 of the statute provides: "The Commission is hereby empowered to raise the cost of a project, \* \* \* by the issuance of state office building revenue bonds of the State, the principal of and interest on which bonds *shall be payable solely from the special fund herein provided for such payment."* (Italics supplied.) Section 10 of the statute, previously quoted in this opinion, provides that nothing contained in the statute "shall be so construed or interpreted as to authorize or permit the incurring of State debt of any kind or nature as contemplated by the provisions of the Constitution of the State of West Virginia in relation to State debt."

The bond resolution issued by the Building Commission contains the following provision:

"Neither the Bonds nor coupons shall be or constitute an indebtedness of the State of West Virginia, but shall be payable solely from the revenues derived from the System and of the Commission as herein provided. *The credit of the State shall not be pledged for the payment of the Bonds, and no holder or holders of any Bond issued hereunder shall ever have the right to compel the exercise of the taxing power of the State of West Virginia to pay the Bonds or the interest thereon."* (Italics supplied.)

The bond resolution provides that it shall constitute a contract between the Building Commission and any holder of one or more of the bonds. Each bondholder, therefore, is bound by a contract with the Building Commission expressly specifying, in the comprehensive language quoted above, that no

bond shall in any sense constitute a state debt. Each bond contains a similar provision on its face. The bond resolution provides further for the appointment of a trustee and that, in the event of default in the payment of any of the bonds, holders of the bonds, constituting twenty per cent of the bonds then outstanding, may direct the trustee, in writing, to enforce every provision and covenant of the bond resolution and that thereupon the trustee "shall be entitled to and shall proceed in any court of competent jurisdiction to take all steps necessary to enforce full compliance with this resolution * * * including as a matter of right to have such court appoint a Special Receiver of the System who shall fix, establish, collect and apply rentals, * * * in the name of the Commission and the bondholders."

Basically the contention of counsel for the petitioners in the prohibition proceeding, and the holding of the Court in this case, is that the evil of the statute consists of the fact that it contemplates that the bonds, if paid, must be paid from a fund created by the statute and that the fund can be maintained and perpetuated solely by general revenue appropriations to be made by the legislature from year to year in the future. This major premise is fallacious for the very reason that money for rent of office space for use or occupancy by state departments and agencies is normally and legally paid by general revenue appropriations made by the legislature. Doubtless the state, through the years, has appropriated countless thousands of dollars from the general revenue funds of the state to pay sums contracted for as rent of buildings and other facilities for use or occupancy by state departments and agencies.

The constitutional question presented for decision is whether the statute creates a state "debt" in violation of Section 4 of Article X of the Constitution of West Virginia. This in turn involves the question whether the statute binds legislatures of future fiscal years to make general revenue appropriations for payment of rent to the various departments or agencies of state government; and whether, in this respect and to this extent, the legislatures of future fiscal years are bound to pay

the bonds and the interest thereon in violation of the constitutional provision in question.

There is not a single sentence, phrase or word in the entire statute which, by any reasonable construction, may be referred to as justification for the Court's adjudication that the statute imposes an obligation upon legislatures of future fiscal years to appropriate any sum of money whatsoever to pay the principal or interest on any of the bonds, or even to pay any general revenue funds as rent for use of any of the buildings in question by any department or agency of state government. The contrary appears, as clearly as it could be stated, in the statute, in the Building Commission's bond resolution which constitutes a contract with the bondholders, and on the face of each of the bonds, all of which bonds are contractual in nature.

The fact that no debt, binding on a legislature for any subsequent fiscal year, is created by the statute is made even more evident by the provisions that, if any subsequent legislature fails to make appropriation for payment of the rent, the leases shall be thereby automatically terminated and by the further provision, in such an eventuality, for court proceedings to be instituted by the trustee for the appointment of a special receiver or for such other court action as might be deemed appropriate or necessary.

The Court's opinion states: "However, the test is not whether a future legislature is *required* to make such appropriations. The test is the authority to do so." The legislature, in enacting the statute here in question, neither undertook to authorize or to inhibit any sort of appropriation by a legislature of any subsequent fiscal year. It had no jurisdictional authority to follow either of such two courses. It is obvious, however, that a legislature of one fiscal year cannot *prohibit* a legislature of a subsequent fiscal year from making a lawful appropriation for such fiscal year. No legislature can prohibit a legislature of a subsequent fiscal year from making a lawful appropriation from general revenue funds to pay an obligation or "debt" incurred in that subsequent fiscal year; nor does this Court have any such constitutional authority.

In this case, it is of no consequence to assert that whether a state debt has been created is a judicial rather than a legislative question; and it is of no consequence to assert that a legislative declaration that no state debt is created is not binding on a court, if the contrary clearly appears from the provisions of the statute in question. In the first place, unlike some statutes which have been involved in court decisions in other states, the statute here in question does not undertake to bind any subsequent legislature to make appropriations for rent from year to year in the future. As has been stated previously, the contrary clearly appears from the provisions of the statute. Furthermore, the fact that no state "debt" is created appears in this case, not from a mere legislative declaration, but by the clear terms of the bond resolution and the bonds themselves which create a *contract* between the Building Commission, as the sole obligor in relation to the bonds, and the bondholders, as the obligees.

In summary, the fact that no "debt" has been created with a purpose of binding any subsequent legislature is made clear not only by statutory language but also by contract. Even if there should exist in this case any reasonable doubt concerning constitutionality, it was the duty of the Court, in compliance with legal principles frequently reiterated in its opinions, to resolve that doubt in favor of constitutionality. The writer of these dissenting views asserts with the utmost assurance that unconstitutionality in this case does not "appear beyond a reasonable doubt" and, therefore, he would deny the writ prayed for in this case.

For reasons stated by the Court in this opinion, a writ of prohibition is awarded as prayed for in the prohibition petition.

*Writ awarded.*