323 S.E.2d 590

**STATE ex rel. WEST VIRGINIA RE-SOURCE RECOVERY—SOLID WASTE DISPOSAL AUTHORITY, etc.**

v.

**Betty E. GILL, as Secretary of the West Virginia Resource Recovery—Solid Waste Disposal Authority, etc.**

No. 16304.

Supreme Court of Appeals of West Virginia.

Dec. 5, 1984.

**110**

James K. Brown, Lee O. Hill, Sarah G. Sullivan, Jackson, Kelly, Holt & O'Farrell, Charleston, for relator.

S. Clark Woodroe, Asst. Atty. Gen., Charleston, for respondent.

HARSHBARGER, Justice:

The West Virginia Resource Recovery—Solid Waste Disposal Authority asks us to compel its secretary, Betty E. Gill, to execute an agreement for it to sell steam to be generated by a proposed solid waste disposal plant, to the West Virginia Board of Regents. The principal question is whether the agreement unconstitutionally creates an indebtedness or pledges the State's credit.

## I.

The authority was created by the legislature as "a governmental instrumentality of the State and a body corporate ...." W.Va.Code, 16–26–4 (1984 Cum.Supp.). Its purpose is

> "to provide for the necessary, dependable, effective and efficient collection, disposal and recycling of solid waste and to assist and cooperate with governmental agencies and the private sector in achieving all the purposes of this article, and to encourage the recycling or extraction of recoverable resources from such solid waste." W.Va.Code, 16–26–2 (1979 Replacement Vol.).

It can sue, be sued, acquire or construct solid waste disposal projects, issue revenue bonds to pay for them, charge, alter and collect rentals, fees and charges, and make contracts to further performance of its functions. W.Va.Code, 16–26–6 (1984 Cum. Supp.).

The board of regents is a state agency and public corporation that also can contract and sue and be sued in its own name. W.Va.Code, 18–26–3 (1984 Replacement Vol.). Among its designated duties is operating West Virginia University located at Morgantown, Monongalia County. *See generally,* W.Va.Code, 18–11–1, *et seq.;* 18–26–1, *et seq.* (1984 Cum.Supp.). It can contract and pay for programs, services and facilities of the university. W.Va. Code, 18–26–10a.

While developing a solid waste disposal project to serve Monongalia County, the authority became aware of the university's critical need to renovate or replace its existing central energy plants to comply with federal air pollution control standards, and negotiated with the board for a project that would also provide energy to the university.

Thereafter, the authority and board agreed that a steam generation plant powered by a combination of solid waste and fossil fuels be built, financed solely by revenue bonds sold by the authority. The board would buy steam for the university, and revenues received from those steam sales would retire the bonds and pay plant operation and maintenance costs.

A "steam purchase agreement" was subsequently drafted. It requires that the board provide a site for the plant on university property and furnish a line for transporting steam from a connection point into the school's steam distribution system. The authority is required to build the plant and piping necessary to get steam to the connection point.

The board must purchase all steam generated by the authority's facility for twenty years, but no less than 600,000,000 pounds annually. The purchase price for this "minimum annual purchase requirement" (MAPR) is to be computed annually based on the authority's projected costs of operation during the ensuing fiscal year. This

base price is to be paid in twelve equal monthly installments due on the first of each month prospectively. Each payment is to include one twelfth of the authority's annual debt service. For every 1,000 pounds of steam the university uses in any month exceeding the MAPR, the board must pay, before the 15th of the following month, for fossil fuel costs and for operating and maintenance expenses needed to produce that extra steam, not included in the base price.

Every six months, the board must pay any deficiency between projected costs and base price and is allowed credit in the computation of the next fiscal year's base price for any amount by which the projected base price in a prior fiscal year exceeds the actual costs in that prior year.

The agreement has a *force majeure* clause permitting either party to suspend performance of the contract without liability for damages for any cause not within its control. Neither party can assign its rights under the agreement without the prior consent by the other, and the board may not resell steam delivered to it without express prior written consent by the authority.

On January 10, 1984, the authority approved the agreement and directed Ms. Gill, in her capacity as its secretary, to affix its official seal and attest to the agreement and send it to the board. However, she refused, asserting that it violated several constitutional and statutory provisions.

Ms. Gill's main concern is that the agreement contemplates retiring the bonds from proceeds of sale of steam to the board over a period of twenty years with funds from the board's annual appropriation by the legislature.[1] She contends that the authority's bonds create a debt of the State violating Article X, Section 4 of the West Virginia Constitution,[2] and pledges the State's credit in violation of Article X, Section 6 of the Constitution.[3] She also contends that the agreement creates an unconstitutional state debt because it requires the board to incur a liability that cannot be paid from current appropriations in violation of W.Va. Code, 12-3-17 (1984 Cum.Supp.).[4]

## II.

The clear purpose of these provisions is to protect the fiscal integrity of the State by prohibiting creation of any present indebtedness that would obligate subsequent legislatures to make appropriations. *See State ex rel. Hall v. Taylor*, 154 W.Va. 659, 178 S.E.2d 48 (1970); *State ex rel. Point Towing Co. v. McDonough*, 150 W.Va. 724, 149 S.E.2d 302 (1966). It is well-established that "bonds of a state or

---

1. The respondent initially stated several other grounds for her refusal to execute the agreement, including (1) the title of the statute creating the authority embraced more than one object in violation of Article VI, Section 30 of the Constitution; (2) the creation of the authority was by special law in violation of Article XI, Section 1; (3) the issuance of bonds was not in conformity with the powers and purposes of the authority under W.Va.Code, 16-26-1, *et seq.;* and (4) the exemption from taxation of the revenue bonds, interest thereon and property of the proposed project violated Article X, Section 1. She has abandoned these contentions.

2. Article X, Section 4 provides:
   "No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."

3. Article X, Section 6 provides:
   "The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."

4. W.Va.Code, 12-3-17 provides, in part:
   "[I]t shall be unlawful for any state board, commission, officer or employee: (1) To incur any liability during any fiscal year which cannot be paid out of the then current appropriation for such year or out of funds received from an emergency appropriation; or (2) to authorize or to pay any account or bill incurred during any fiscal year out of the appropriation for the following fiscal year ...."

political subdivision payable solely out of revenue derived from a utility of a public nature acquired by the money derived from the bonds do not create debts within the constitutional inhibition against the contraction of public debt, but partake of the nature of purchase-money mortgages." *Brewer v. City of Point Pleasant*, 114 W.Va. 572, 172 S.E. 717, 720 (1934), *quoting Bates v. State Bridge Commission*, 109 W.Va. 186, 188–189, 153 S.E. 305, 307 (1930).

This "special fund doctrine" has been applied to bonds of a state agency payable wholly from a special fund created and maintained by revenues derived from a self-liquidating project. *See, e.g., State ex rel. County Court v. Demus*, 148 W.Va. 398, 135 S.E.2d 352 (1964); *State ex rel. Board of Governors v. O'Brien*, 142 W.Va. 88, 94 S.E.2d 446 (1956); *State ex rel. State Road Commission v. O'Brien*, 140 W.Va. 114, 82 S.E.2d 903 (1954).[5]

In *State ex rel. Hall v. Taylor*, 154 W.Va. 659, 178 S.E.2d 48 (1970), however, the special fund doctrine was held not applicable to a statute authorizing the State Building Commission to finance office building construction by issuing bonds payable from revenues generated by leasing office space to various state agencies. The majority in *Hall* reasoned that because the fund was maintained by rentals derived from annual legislative appropriations from general revenues to the respective state agencies, the scheme created an illegal State debt.

The Court wrote that the special fund doctrine

is applied uniformly in relation to projects or facilities which are self-liquidating, such as the toll bridge cases. Some courts hold that the doctrine applies in any case of a fund created by a special excise tax as distinguished from property taxes. Other courts hold that the doctrine cannot be lawfully applied to a fund created by a special excise tax. *It*

*seems to be uniformly held, however, that the doctrine cannot be applied to a fund which is created and maintained, in whole or in part, by general tax revenues*, for the reason that such would clearly violate the purpose and intent of constitutional provisions such as that involved in this case. (Emphasis supplied.) 154 W.Va. at 672, 178 S.E.2d at 56.

We held that characterizing the bonds as "revenue" bonds could not save the statute.

This Court has never held valid any act of the legislature authorizing the issuance and sale of bonds, whether they be termed "revenue" bonds or otherwise, where the principal and the interest of such bonds are to be paid from year to year from the general revenue funds of the State. It is the view of this Court that the legislature has no such authority .... Although the bonds in question are designated as "revenue" bonds, the term "revenue" bonds means that, over a period of twenty or more years, the principal and interest of the bonds are paid from sources other than the taxes of the people of this State which go into the general revenue fund. 154 W.Va. at 676, 178 S.E.2d at 58.

The Court concluded that those "revenue" bonds were in fact unconstitutional general obligation bonds, comparing them to state road construction bonds that require, for validity, constitutional authorization.

Ms. Gill relies on *Hall*. It is uncontested that the board's payments for steam will come principally from legislative appropriations. But the ultimate source of revenues from which bonds are payable is not necessarily determinative.

There is no proposal that these bonds be secured by the general credit or property of the State or even by the general credit or property of the board. Indeed, here, as

---

5. A similar rule has been applied to uphold the constitutionality of self-liquidating revenue bonds issued by local governing bodies, construing the debt limitation provisions of Article X, Section 8. *See State ex rel. County Court v.*

*Demus, supra; Warden v. City of Grafton*, 115 W.Va. 438, 176 S.E. 706 (1934); *Casto v. Town of Ripley*, 114 W.Va. 668, 173 S.E. 886 (1934); *Brewer v. City of Point Pleasant, supra.*

in *Hall*, the bond legislation expressly disclaims that they create any state debt or liability. W.Va.Code, 16–26–10 (1979 Replacement Vol.), authorizing issuance of the bonds, states: "Except as may otherwise be expressly provided in this article or by the authority, every issue of its bonds or notes *shall be obligations of the authority payable out of the revenues and reserves created for such purposes* by the authority, which are pledged for such payment ...." (Emphasis supplied.) In addition, W.Va.Code, 16–26–13 (1979 Replacement Vol.) states:

> Solid waste disposal revenue bonds and notes ... issued under authority of this article ... *shall not constitute a debt or pledge of the faith and credit or taxing power of this State* or of any county, municipality or any other political subdivision of this State, *and the holders or owners thereof shall have no right to have taxes levied by the legislature* or taxing authority of any county, municipality or other political subdivision of this State *for the payment of the principal thereof or the interest thereon, but such bonds and notes shall be payable solely from the revenues and funds pledged for their payment* as authorized by this article .... (Emphasis supplied.)

This section further requires that each bond carry a statement on its face that it does not create a debt or liability of the State, but is payable solely from revenues and reserves of the authority. *Id.*

*Hall* discounted such disclaimers in the statute and in the resolution authorizing issuance of the bonds and on the face of the bonds themselves, finding that "mere legislative declaration that a state debt is not created by the statute is not conclusive or binding upon a court. Whether a state debt is created by the statute is a judicial question, rather than a legislative question." 154 W.Va. at 674, 178 S.E.2d at 54. We agree with this principle, but would add that no court could force the legislature to appropriate money to pay bonds issued with such precise, unmistakable disclaimers. Judge Calhoun wrote in his *Hall* dissent that "it is of no consequence to assert that a legislative declaration is not binding

on a court, if the contrary clearly appears from the provisions of the statute in question." 154 W.Va. at 687, 178 S.E.2d at 64.

It is evident that the authority's proposal contemplates nothing more than a pledge of income actually received from the board and other sources. Assuming that the bonds will contain proper statements to this effect on their face, this condition will become a part of the contracts with the bondholders and place them on notice about the source of funds from which the bonds will be redeemed. The fact that income to the fund may be legislatively appropriated is incidental.

> "Basically ... the holding of the Court in this case is, that the evil of the statute consists of the fact that it contemplates that the bonds, if paid, must be paid from a fund created by the statute and that the fund can be maintained and perpetuated solely by general revenue appropriations to be made by the Legislature from year to year in the future. This major premise is fallacious for the very reason that money for rent of office space for use or occupancy by state departments and agencies is normally and legally paid by general revenue appropriations made by the legislature. Doubtless the state, through the years, has appropriated countless thousands of dollars from the general revenue funds of the State to pay sums contracted for as rent of buildings and other facilities for use or occupancy by state departments and agencies." 154 W.Va. at 685, 178 S.E.2d at 63 (Calhoun, J., dissenting).

And certainly the legislature can refuse to appropriate that money any year it wants to do so.

If the determinative issue is not the source of the revenues, it must be whether the bonding scheme "would bind subsequent legislatures to make appropriations in subsequent fiscal years." *State ex rel. Hall v. Taylor, supra* 154 W.Va. at 673, 178 S.E.2d at 56.

*Hall* decided that the leases there created a state debt because they required legislatures to appropriate general revenue

funds for leasing office space over a period of years. The leases extended from fiscal year to fiscal year with a presumption of renewal unless cancelled by the parties; and expressly conditioned payment of rent upon the availability of funds; and provided for automatic cancellation if the legislature failed to appropriate rent money. *Hall* described the obligation as "a debt which, in the contemplation of the statute, must necessarily be paid in annual installments over a period of years and by successive legislatures from fiscal year to fiscal year." 154 W.Va. at 674, 178 S.E.2d at 57. The majority concluded that it did not matter whether future legislatures were required by the statute to appropriate money for rent, but only whether the statute *authorized* such appropriations. Accordingly, it held that the net effect of the leasing scheme was to bind the general tax revenues of successive legislatures.

There is a world of difference between authorizing future legislatures to act and requiring them to do so. As Calhoun wrote, we had previously held that legislation does not necessarily violate the constitutional debt limitation simply because it anticipates future appropriations of public funds from year to year to effect the purposes of the act. In *State ex rel. Dyer v. Sims*, 134 W.Va. 278, 290, 58 S.E.2d 766, 773 (1950), the Court held:

> Ordinarily, the creation of a State board or commission which requires an appropriation of public funds to carry out its purposes is not treated as the creation of a debt, although its generally contemplated continuation from year to year, and for an indefinite period, must necessarily involve future appropriations. Practically all agencies created by the Legislature require appropriations from time to time, and that was necessarily contemplated at the time they were created.

Thus, although there is an expectation of continued appropriations by the legislature, there is no prohibited state debt or pledge of credit if the legislature is not *obligated* to act. *See Baliles v. Mazur*, 224 Va. 462, 297 S.E.2d 695 (1982).

■ Long term contracts for the purchase of necessary services, such as electricity and water, have long been held not to violate constitutional and statutory provisions prohibiting municipal corporations from incurring indebtedness, when the agreements specify that periodic installments will be paid as the service is furnished. Those contracts do not create a present indebtedness for the aggregate of all installments for the term of the contracts contrary to the municipal debt limitation provisions of Article X, Section 8 of the Constitution and W.Va.Code, 11-8-26, but are obligations that mature periodically as each installment comes due. *Allison v. City of Chester*, 69 W.Va. 533, 72 S.E. 472 (1911). *See also City of Walla Walla v. Walla Walla Water Co.*, 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898); *Crowder v. Town of Sullivan*, 128 Ind. 486, 28 N.E. 94 (1891); *Board of Supervisors of Fairfax County v. Massey*, 210 Va. 680, 173 S.E.2d 869 (1970). *See generally*, Annot., 103 A.L.R. 1160 (1936); 15 McQuillan, *Municipal Corporations*, § 41.37 (3rd Ed.1970). *See also Huntington Water Corp. v. City of Huntington*, 115 W.Va. 531, 177 S.E. 290 (1934); *Allison v. City of Chester*, *supra*. *See also Appalachian Electric Power Co. v. State Road Commission*, 117 W.Va. 200, 185 S.E. 223 (1936); *Ireland v. Board of Education*, 115 W.Va. 614, 177 S.E. 452 (1934).

We see no reason why the so-called "service contract doctrine" should not apply to contracts entered into by the State or its agencies to buy energy. *See State ex rel. Hall v. Taylor, supra* 154 W.Va., at 682–684, 178 S.E.2d at 62 (Calhoun, J., dissenting).

## CONCLUSION

■ Accordingly, we conclude that neither the steam purchase agreement nor the proposed bonds themselves create unconstitutional State debts. *State ex rel. Hall v. Taylor, supra*, is overruled insofar as it finds any agreement whereby bonds of a state agency are to be discharged from a fund created in whole or in part by legislative appropriations of the general revenue

funds of the State to be unconstitutional. The ultimate issue in determining whether bond financing creates a state debt in violation of Article X, Section 4 is not whether the bonds may be paid from future legislative appropriations, but whether successive legislatures are obligated to make such appropriations.

Having decided that the agreement does not create an unlawful State debt, it is evident that it works neither a pledge of the State's credit nor an unlawfully extended obligation upon a state agency. The respondent had a mandatory duty to affix the authority's seal to the agreement, and we issue the mandamus prayed for to compel her to do so.

Writ awarded.