441 S.E.2d 386

**STATE of West Virginia ex rel. COUNCIL OF the CITY OF CHARLESTON; Linda Nielson; and West Virginia Waste Services, Inc., Petitioners,**

v.

**Kent Strange HALL, as Mayor of the City of Charleston, Respondent.**

No. 22067.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 1994.

Decided Feb. 18, 1994.

8. *See* note 2, *supra*.

Webster J. Arceneaux, III, Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, for petitioners, Council of the City of Charleston and Linda Nielson.

Robert D. Pollitt and Michael J. Funk, Steptoe & Johnson, Charleston, for petitioner, West Virginia Waste Services, Inc.

Thomas M. Hayes, Charleston, for respondent.

McHUGH, Justice:

The petitioners, the Council of the City of Charleston (hereinafter the Council), Linda Nielson (a member of the Council, and a citizen, taxpayer, and voter of the City), and West Virginia Waste Services, Inc. (hereinafter West Virginia Waste), seek a writ of mandamus to compel the respondent, the Mayor of Charleston, Kent Strange Hall, to execute, on behalf of the City of Charleston, the agreement, which is attached to the petition, between the City of Charleston and West Virginia Waste.

The petitioners contend that the agreement is necessary to perform the required twelve to sixteen million dollar upgrade of the City's existing solid waste facility, and to continue its operation after the September 30, 1994 legislatively imposed deadline for the closing of all unlined solid waste facilities within West Virginia. The respondent declines to execute the agreement until this Court determines whether or not the agreement creates an unconstitutional debt in violation of the *West Virginia Constitution* art. X, § 8 or in violation of *W.Va.Code,* 11–8–26 [1963]. This Court issued a writ of manda-

mus by an order dated January 27, 1994, directing the respondent to execute the agreement between the City of Charleston and West Virginia Waste. We indicated in the January 27, 1994 order that this opinion would follow explaining why we find that the agreement does not create an unconstitutional debt nor violate *W.Va.Code,* 11–8–26 [1963].

## I

The City has operated a solid waste facility, more commonly known as a landfill, for twenty years. However, due to amendments of the West Virginia solid waste laws, the City is required to have its solid waste facility upgraded and in compliance with the more stringent environmental laws by September 30, 1994, or the facility will be required to cease operations. *See W.Va.Code,* 20–5F–8 [1993]. The City explored various options to raise the necessary capital to upgrade its solid waste facility, but concluded that its only option was to contract out the operation of the facility.

West Virginia Waste was selected to negotiate an agreement to provide for the construction, operation, and management of the City's solid waste facility. On November 1, 1993, the Council approved the terms and conditions of the agreement and directed the mayor to execute the agreement on behalf of the City. On December 6, 1993, the Council approved amendments to the agreement and directed the mayor to execute the agreement as amended.

The agreement provides that the City, for 25 years, shall dispose of all solid waste collected by the City within the City at the solid waste facility operated by West Virginia Waste. In consideration for West Virginia Waste accepting and disposing of the waste, the City is to pay a certain rate for each ton of waste delivered to the facility. Additionally, the agreement provides that in the event the agreement is terminated before the expiration of the twenty-five-year term by the happening of certain enumerated events, the City shall purchase from West Virginia Waste the improvements made to its solid waste facility by West Virginia Waste.[1]

The mayor wrote a letter dated December 14, 1993, to the Council informing it of his refusal to execute the agreement since he was concerned that the agreement may create an unlawful debt in violation of *W.Va. Const.* art. X, § 8 or in violation of *W.Va. Code,* 11–8–26 [1963]. In response to the mayor's letter the petitioners filed the petition for a writ of mandamus which is the subject of this opinion. The respondent was provided an opportunity to respond to such rule. After oral argument before this Court, the parties made certain modifications to the agreement on January 18, 1994, and forwarded those modifications to this Court by a letter dated January 20, 1994. When we refer to the agreement in this opinion, we are referring to the agreement with the January 18, 1994 modifications. There are three issues which this Court considered when we issued the writ of mandamus compelling the mayor to execute the agreement between the City of Charleston and West Virginia Waste.

## II

The first issue is whether entry by the City into a contract whereby, for a term of twenty-five years, the City is obligated to dispose of all solid waste collected by it within the City at the solid waste facility operated by West Virginia Waste and is obligated to pay a certain rate for each ton of solid waste so handled violates *W.Va. Const.* art. X, § 8 or *W.Va.Code,* 11–8–26 [1963].

*W.Va. Const.* art. X, § 8 states:

§ 8. No county, city, school district, or municipal corporation, except in cases where such corporations have already authorized their bonds to be issued, shall hereafter be allowed to become indebted, in any manner, or for any purpose to an amount, including existing indebtedness, in the aggregate, exceeding five per centum on the value of the taxable property therein to be ascertained by the last assessment for State and county taxes, previous to the

---

1. Without going into any detail, ¶ 5.21 of the agreement provides that the purchase price of the improvements will be the capital investment

to date less accumulated depreciation plus seven percent.

incurring of such indebtedness; nor without, at the same time, providing for the collection of a direct annual tax on all taxable property therein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article, [*W.Va. Const.* art. X, § 1 concerns taxation and finance] separate and apart from and in addition to all other taxes for all other purposes, sufficient to pay, annually, the interest on such debt, and the principal thereof, within, and not exceeding thirty-four years.... Provided, that no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a vote of the people, and have received three fifths of all the votes cast for and against the same.

*W.Va.Code,* 11–8–26 [1963] states:

Except as provided in sections fourteen-b, twenty-five-a and twenty-six-a [§§ 11–8–14b, 11–8–25a and 11–8–26a] [2] of this article, a local fiscal body shall not expend money or incur obligations:

(1) In an unauthorized manner;

(2) For an unauthorized purpose;

(3) In excess of the amount allocated to the fund in the levy order;

(4) In excess of the funds available for current expenses.

Notwithstanding the foregoing and any other provision of law to the contrary, a local fiscal body or its duly authorized officials shall not be penalized for a casual deficit which does not exceed its approved levy estimate by more than three per cent, provided such casual deficit be satisfied in the levy estimate for the succeeding fiscal year.

(footnote added). The constitutional provision and statute, quoted above, limit a municipality's power to contract for a debt without voter approval and are very similar to the limitations placed on the State's ability to contract a debt under *W.Va. Const.* art. X, § 4.[3]

As the petitioners point out, historically, this Court has held:

Long term contracts for the purchase of necessary services, such as electricity and water, have long been held not to violate constitutional and statutory provisions prohibiting municipal corporations from incurring indebtedness, when the agreements specify that periodic installments will be paid as the service is furnished. Those contracts do not create a present indebtedness for the aggregate of all installments for the term of the contracts contrary to the municipal debt limitation provisions of [*W.Va. Const.* art. X, § 8 and *W.Va. Code,* 11–8–26 [1963]], but are obligations that mature periodically as each installment comes due.

*State ex rel. W.Va. Resource Recovery v. Gill,* 174 W.Va. 109, 114, 323 S.E.2d 590, 595 (1984), *overruled, in part, on other grounds, Winkler v. School Bldg. Authority,* 189 W.Va. 748, 757, 434 S.E.2d 420, 429 (1993). However, this Court stressed in *Appalachian Electric Power Co. v. State Road Commission,* 117 W.Va. 200, 203, 185 S.E. 223, 225 (1936), that the payments due for the first year under the contracts for the purchase of necessary services must be made from the municipality's current levy.

■ Today solid waste disposal is a necessary service which is heavily regulated in order to protect the environment. Therefore, like contracts for water and electricity the contract for solid waste disposal, which is paid in installments as the service is furnished, does not violate constitutional or statutory provisions prohibiting municipal corporations from incurring indebtedness as long as the payments for the first year under the contract could be made from current reve-

**2.** *W.Va.Code,* 11–8–14b [1963] concerns the levy of additional tax. *W.Va.Code,* 11–8–25a [1958] concerns the right of a county commission to expend surplus funds for equalization and revaluation. *W.Va.Code,* 11–8–26a [1963] concerns the revision of levy estimates.

**3.** *W.Va. Const.* art. X, § 4 states:

No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years.

nue. We note that the case before us is distinguishable from the contracts for a necessary service which are paid from a municipality's general fund, because the agreement in the case before us specifies that the city will pay West Virginia Waste's services out of a special fund which is "comprised of revenue derived by the City from charges for refuse disposal services[.]" Agreement ¶ 5.02, in part.[4]

■ However, as the petitioners correctly point out, this Court has also approved the payment of revenue bonds that are liquidated out of a special fund. *See Winkler,* 189 W.Va. at 757, 434 S.E.2d at 429. In *Winkler,* which involves the State's ability to contract a debt under *W.Va. Const.* art. X, § 4, this Court explained the rationale of the special fund doctrine:

> First, the special fund doctrine is based on the fact that a *specific source of revenue* is required to be identified and committed to the repayment of the bonds beyond mere annual appropriations from the general revenue fund. Second, by identifying and dedicating this specific source of funds, the process automatically limits the total value of bonds that can be used.

*Id.* at 758, 434 S.E.2d at 430 (emphasis in original). Although the case before us does not involve revenue bonds the rationale given in *Winkler* for the special fund doctrine is applicable to the case before us.

The City of Charleston has identified a specific source of revenue other than funds from the general revenue fund to pay for West Virginia Waste's services. As we noted earlier, West Virginia Waste's services will be paid from a fund "comprised of revenue derived by the City from charges for refuse disposal services[.]" Agreement ¶ 5.02, in part. Furthermore, the money collected will limit the total amount that can be spent on the services provided by West Virginia Waste. Although there are no bonds which

will be retired in the case before us, the situation where a special fund is used to retire a bond is strikingly similar to the situation where a special fund is used to pay for a long-term service.

Accordingly, we hold that *W.Va. Const.* art. X, § 8 does not preclude a contract for a term of twenty-five years whereby a city is obligated to pay a fee for solid waste disposal when that fee comes from a special fund collected by the city for such solid waste disposal.

### III

■ The second issue, as framed by the petitioners, is whether entry by the City into a contract whereby, upon premature termination of the agreement caused by the happening of certain contingencies, the City is obligated to purchase the capital investments, minus accumulated depreciation, made to the solid waste facility by West Virginia Waste violates *W.Va. Const.* art. X, § 8 or *W.Va.Code,* 11–8–26 [1963]. This issue is the more difficult issue.

The agreement has two sections which outline when the City may buy back the improvements made to the solid waste facility. Under ¶ 5.20 of the agreement, the City has the option to buy back the improvements at years five and ten of the agreement. Under ¶ 5.21 of the agreement, the City will buy back the improvements if it *chooses* to terminate the agreement because West Virginia Waste fails to provide a financial assurance of performance (i.e., performance bond) or if West Virginia Waste defaults (meaning West Virginia Waste has failed to perform its duties adequately) under the agreement. Therefore, the buy-back provisions only become operative when the City decides to make those provisions operative.

The petitioners provide a detailed discussion of what they designate as the contingent

---

4. ¶ 5.02 of the agreement states, in full:

    5.02. *City to Establish Separate Fund.* In order to meet its obligations under this Agreement, the City shall establish a separate fund by Ordinance for the payment of the agreed rates scheduled to be paid for the disposal of solid waste under this Agreement. The City is expressly limited to payment of the rates for

waste disposal at the solid waste facility from the separate fund established for that purpose. Said separate fund shall be comprised of revenue derived by the City from charges for refuse disposal services and said charges shall remain at sums sufficient to meet the City's obligations under this Agreement.

liability doctrine. Their argument is that merely incurring a contingent future liability does not create an indebtedness which falls within the scope of the constitutional limitations. The rationale is that if the liability is contingent there is no way of knowing whether there will be a debt. Furthermore, if the contingency occurs and there is a debt, there is no way of knowing what the amount of the debt will be.

The following discussion from *The Law of Municipal Corporations* indicates that there is no bright-line standard on when a contingent liability creates an indebtedness:

> Merely incurring a contingent future liability does not create an indebtedness. Thus, a contract to pay a fixed price annually, where contingent on the supply furnished, does not create an indebtedness. But it is held in some jurisdictions that a debt payable upon a contingency, as upon the happening of some event, such as the rendering of service or delivery of property, is no less a debt, and therefore, within the constitutional prohibition.

15 Eugene McQuillin, *The Law of Municipal Corporations* § 41.23 (3d ed. 1985) (footnotes omitted). Additionally, we could not find a case nor have the parties provided us with a case which sets forth parameters on when a contingent future liability is a debt subject to constitutional limitations.

The petitioners argue that in the case before us the contingency is not likely to occur. However, what if the contingency is more than likely to occur? Will the debt not be subject to constitutional limitations? If it is not subject to constitutional limitations will that open the door to municipalities creatively by-passing the constitutional limitations on debt? The contingent liability doctrine is confusing and cannot easily be put into some sort of standard.

In many of the cases cited by the petitioners, the City has no control over the contingency. Instead, some outside event controls when the contingency implements the debt.

For instance, in *Woodmansee v. Kansas City*, 346 Mo. 919, 144 S.W.2d 137 (1940) a city ordinance authorized the issuance of bonds to finance improvements of the city market. The bonds were payable from the income of the market. However, if the market's income was insufficient to both retire the bonds and pay for the market's operation and repair, then the City would pay for the operation and repair of the market from its general revenues. The court in *Woodmansee* found that the City's obligation to pay was contingent upon the insufficiency of the market's income; therefore, the obligation was not an unconstitutional debt. *See also Davidson v. City of Elmira*, 180 Misc. 1052, 44 N.Y.S.2d 302 (N.Y.Sup.1943), *aff'd*, 267 A.D. 797, 46 N.Y.S.2d 655 (N.Y.App.Div. 1943), *appeal denied*, 267 A.D. 926, 47 N.Y.S.2d 604 (N.Y.App.Div.1944) (city paid for housing project from proceeds of project, but guaranteed funds if proceeds from project were insufficient); *Pearson v. Salt Lake County*, 9 Utah 2d 388, 346 P.2d 155 (1959) (county guaranteed payment of improvement bonds if collections from assessed properties would be insufficient to pay the bond debt); *Kelly v. City of Sunnyside*, 168 Wash. 95, 11 P.2d 230 (1932) (city guaranteed payment of improvement bonds if bonds could not be paid by local assessment funds).

In *Woodmansee* the market's income was the force which determined whether the City would contribute to the retirement of the bonds. Unlike the case before us, the City in *Woodmansee* did not control when such contribution would be made to retire the bonds.

The City of Charleston chooses when and if it will buy back the improvements to its solid waste facility. The buy-back provisions are not implemented by some outside event which is beyond the City's control.[5] Because

---

5. This Court finds the City's control to be significant. Before oral arguments on the case before us, the agreement stated that if a governmental entity took any action which precluded the operation of the solid waste facility, then the agreement would terminate and the city would *have* to buy back the improvements. The parties deleted that provision after this Court expressed serious

reservations about the constitutionality of any entity other than the City determining when the buy-back provisions of the agreement would become operative. If such a provision were in the agreement then the threat of a debt which exceeds constitutional and statutory limits would be greater since the City would be unable to

we find that a decision which turns on the contingent liability doctrine is not necessary in this case, we decline to further address the doctrine in this opinion.[6]

■ Accordingly, we hold that the provisions of an agreement which provide a city the option of buying back improvements made to its solid waste facility at certain years of the agreement or when the City chooses to prematurely terminate the agreement, do not violate *W.Va. Const.* art. X, § 8 or *W.Va.Code,* 11–8–26 [1963] since the City decides when or if it will buy back the improvements to the solid waste facility. However, if the City chooses to buy back the improvements made to the solid waste facility it must do so without violating *W.Va. Const.* art. X, § 8 or *W.Va.Code,* 11–8–26 [1963].

### IV

■ The last issue is whether the petitioners are entitled to the issuance of a writ of mandamus. In syllabus point 2 of *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969), this Court stated: "A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy."

■ It is well established that "public officers, or boards of officers, may maintain proceedings in mandamus to compel other officers to perform ministerial acts, which come within the scope of their supervision or which are necessary to be performed in order to enable such officer or board to perform its own duties." *State ex rel. Board of Education v. Cavendish,* 81 W.Va. 266, 266–67, 94 S.E. 149 (1917) (citations omitted). The mayor has a ministerial duty to execute the agreement.

*W.Va.Code,* 8–10–1 [1976] states, in pertinent part, that "the mayor of every municipality ... shall see that the ordinances, orders, bylaws, acts, resolutions, rules and regulations of the governing body thereof are faithfully executed." Additionally, § 15 of the Charter of the City of Charleston provides, in part, that "the mayor ... shall ... perform such ... duties as the council may require of [him]."

The Council was acting under its authority to construct and maintain facilities for solid waste disposal set forth in *W.Va.Code,* 8–12–5(10) and (11) [1989] when it negotiated the agreement with West Virginia Waste. Therefore, the Council can require the mayor to execute the agreement.

Furthermore, we find that the petitioners are entitled to have the agreement executed since it does not violate the debt provision of the Constitution. Additionally, since there is no other adequate remedy, we find that mandamus is the proper remedy to compel the mayor to execute the agreement.

### V

In conclusion, the agreement does not violate *W.Va. Const.* art. X, § 8 or *W.Va.Code,* 11–8–26 [1963]. However, if the City of Charleston opts to buy back the improvements under ¶ 5.20 of the agreement or chooses to buy back the improvements because it has chosen to terminate the agreement because West Virginia Waste has defaulted or failed to provide an adequate financial assurance of performance, then the City of Charleston must make sure that the buying of the improvements does not violate the Constitution.

Writ granted.

---

determine when it could afford to buy back the improvements to the solid waste facility.

**6.** Previously, this Court, in dicta, discussed the doctrine in *Allison v. City of Chester,* 69 W.Va. 533, 536, 72 S.E. 472, 473 (1911) and *Spilman v. City of Parkersburg,* 35 W.Va. 605, 614, 14 S.E.

279, 282 (1891), in which it was not necessary to those decisions. The court inferred that it would find a contingent future liability a debt. As a result, the dicta in those cases was noted in the petition in this case.