475 S.E.2d 483 (1996)
197 W.Va. 391
STATE of West Virginia ex rel. the COUNTY COMMISSION OF BOONE COUNTY, a Public Body Corporate of the State of West Virginia, Petitioner,
v.
Ed COOKE, Clerk of the County Commission of Boone County, Respondent.
No. 23375.
Supreme Court of Appeals of West Virginia.
Submitted May 28, 1996.
Decided July 17, 1996.
*484 James K. Brown, Lee O. Hill, Lee van Egmond, Jackson & Kelly, Charleston, for Petitioner.
L. Lee Javins, II, Shaffer & Shaffer, Madison, for Respondent.
Joseph W. Powell, President, West Virginia AFL-CIO, Charleston, Amicus Curiae.
Michael L. Clowser, Executive Director, Contractors Association of West Virginia, Charleston, Amicus Curiae.
McHUGH, Chief Justice.
The petitioner, the County Commission of Boone County (hereinafter the "County Commission"), seeks a writ of mandamus to compel the respondent, Ed Cooke, the Clerk of the County Commission of Boone County (hereinafter the "Clerk"), to publish notice of a public hearing, pursuant to The Tax Increment Financing Act found in W. Va.Code, 7-11B-1, et seq. [1995], regarding the issuance of tax increment bonds for the purpose of financing a county water project which will be referred to as the Boone County Development Project. The Clerk refused to publish *485 the notice of the hearing because he asserts that the Tax Increment Financing Act is unconstitutional on many grounds. For reasons explained below, we decline to issue a writ of mandamus.

I.
In order to facilitate an understanding of this case, it is necessary to initially analyze the Tax Increment Financing Act. That analysis will be applied to the Boone County Development Project.

A.

The Tax Increment Financing Act
The Tax Increment Financing Act allows a private project developer and a county commission to jointly make capital improvements or build facilities which result "in the increase in the value of property located in the area or encourage increased employment within the area[.]" W. Va.Code, 7-11B-2 [1995]. More specifically, the act authorizes a county commission to issue tax increment obligations[1] in order to finance "development projects to foster economic development, including infrastructure and other public improvements prerequisite to private improvements[.]" W. Va.Code, 7-11B-4(c) [1995].
The objective of the Tax Increment Financing Act is to use the increased ad valorem tax revenue which is generated as a result of the development project to pay the principal of and interest on the tax increment obligations. The underlying premise of the tax increment financing scheme is the assumption that the assessed property value of the private project will increase as a result of the development project thereby increasing the amount of ad valorem taxes collected. Thus, in order to measure the increased assessed property value, the act initially requires a base assessed value to be established on the private project property. W. Va.Code, 7-11B-4(a) [1995]. The base assessed value is the taxable assessed value of the private project property in the year preceding the county's adoption of a tax increment financing plan. W. Va.Code, 7-11B-3(b) [1995].[2] After the tax increment financing plan is adopted by the county commission "the amount of tax attributable to the amount by which the current assessed value of a private project in a development project area exceeds the base assessed value, if any, of such private project, less the portion of tax allocated to the state[,]" is called the "tax increment." W. Va.Code, 7-11B-3(i) [1995]. The tax increment is paid to the tax increment financing fund which, in turn, is used to pay the principal of and interest on tax increment obligations. W. Va.Code, 7-11B-4(a)(3) [1995]. Thus, the tax increment is the amount of additional ad valorem taxes collected as a result of the increase in the value of the private project property.
The process by which a county commission finances a project using tax increment financing begins when an agency or project developer requests the county commission to adopt a tax increment financing plan[3] "with respect to a development project to be developed [by the county] in conjunction with a private project of a project developer." W. Va.Code, 7-11B-4(a) [1995]. Before the county commission may enter an order approving a tax increment financing plan, the *486 county commission must hold a public hearing regarding the proposed plan. W. Va. Code, 7-11B-4(b) [1995]. The county commission must also submit the tax increment financing plan to the voters and receive an approving vote of three-fifths of the participating voters. W. Va.Code, 7-11B-6(b) [1995].
Once approved by the voters, the county commission is authorized to issue the tax increment obligations. W. Va.Code, 7-11B-6(a) [1995]. The county commission is also authorized to dedicate the tax increment, if any, to the tax increment financing fund. W. Va.Code, 7-11B-4(a)(3) [1995]. The moneys in the tax increment financing fund are then "used to pay the principal of and interest on tax increment obligations issued to finance the costs of such development project." Id. The Tax Increment Financing Act does not change the rate of taxation; however, when a tax increment financing plan is adopted the allocation of a portion of the ad valorem tax assessed on the private project property is changed. The increase in assessed property value of the private project property does not directly inure to the benefit of other levying bodies such as the board of education.
The county's development project is to "be sold, leased with an option by the lessee to purchase, leased or otherwise disposed of to a project developer." W. Va.Code, 7-11B-6(a) [1995]. In the event the moneys collected from the tax increment are insufficient to pay the principal of and interest on the tax increment obligations
then such bonds or notes shall be payable out of the revenues derived from the lease, lease with an option by the lessee to purchase, sale or other disposition in connection with the development project for which the bonds or notes are issued, or any other revenue derived from such project.
W. Va.Code, 7-11B-6(a) [1995]. The legislature has by reference to W. Va.Code, 13-2C-7 [1975] in the Tax Increment Financing Act stated that the bonds do not constitute an indebtedness of the county issuing them within the meaning of the Constitution of West Virginia. W. Va.Code, 7-11B-6(a) [1995].[4] Additionally, the Tax Increment Financing Act makes clear "that the portion of property taxes allocable to the state shall be paid over to the state in accordance with law."[5]W. Va.Code, 7-11B-4(a)(3) [1995].
When the tax increment obligations are retired, the tax increment financing fund is to be dissolved and the tax increment is to be "paid into the general fund of the taxing units in proportion to their respective contributions to the fund." W. Va.Code, 7-11B-7(a) [1995]. The act further states that upon the dissolution of the tax increment financing fund the "real and tangible personal property shall be assessed and taxes collected and allocated in the same manner as applicable in the year preceding the adoption of the tax *487 increment financing order." W. Va.Code, 7-11B-7(b) [1995].

B.

The Boone County Development Project
Sometime in 1995 the West Virginia-American Water Company (hereinafter the "Water Company") requested the County Commission to adopt a tax increment financing plan pursuant to the Tax Increment Financing Act in order to improve water service in Boone County. The plan would require the County Commission to work in conjunction with the Water Company in order to implement the improvements in water service. More specifically, the Water Company would agree to undertake certain company projects such as constructing water mains, and the County Commission likewise would agree to undertake a county project of constructing other water mains. The estimated cost to the Water Company for the company project is $9,430,000.00. The estimated cost to the County Commission for the county project is $5,396,000.00.
The Water Company informed the County Commission that the project by the county was not likely to occur without tax increment financing. See W. Va.Code, 7-11B-4(c) [1995]. Therefore, the Water Company requested the County Commission to approve a tax increment financing plan in order to finance the county project through the issuance of tax increment obligations (bonds). The principal amount of the tax increment obligations (bonds) was not to exceed $5,500,000.00, the interest rate was not to exceed 10%, and the obligations (bonds) were to mature no later than thirty years. The Water Company estimates that due to an increase in property values from the project, an extra $141,800.00 in taxes per year could be placed into the tax increment financing fund to pay the principal of and interest on the tax increment obligations (bonds) issued by the County Commission to finance the cost of the county project.
Furthermore, the Water Company agreed to enter into a lease agreement regarding the county project with the County Commission whereby the Water Company will operate, maintain and pay rent on the county project in an amount necessary to pay the principal of and interest on the obligations (bonds) in the event the moneys in the tax increment financing fund are inadequate to make such payments. See W. Va.Code, 7-11B-6(a) [1995].
Because the County Commission must hold a public hearing pursuant to W. Va.Code, 7-11B-4(b) [1995] regarding the issuance of the tax increment obligations (bonds) prior to entering an order approving the tax increment financing plan, the County Commission directed the Clerk to publish the notice of the public hearing. As indicated above, the Clerk refused to publish notice of the public hearing because he maintains the Tax Increment Financing Act is unconstitutional. More specifically, the Clerk asserts that the Tax Increment Financing Act creates an unconstitutional debt in violation of W. Va. Const. art. X, § 8; unconstitutionally extends the credit of the State to aid a county in violation of W. Va. Const. art. X, § 6; unconstitutionally reduces expenditures for public education; violates a citizen's right to equal protection of the laws and due process pursuant to U.S. Const. amend. XIV and W. Va. Const. art. III, § 10; and creates unequal taxation of county property in violation of W. Va. Const. art. X, § 1.

II.
We stress that the desirability of the proposed water project is not the issue. Increasing the property values, encouraging increased employment, and seeking better delivery of water within Boone County are laudable goals. Therefore, we do not doubt the salutary purposes of the Tax Increment Financing Act. The role of this Court, however, is not to recognize the benefits of statutory enactments. We must "determine `the constitutionality of the law.'" Farley v. Graney, 146 W.Va. 22, 32, 119 S.E.2d 833, 840 (1960) (citing W. Va. Const. art. VIII, § 3). We recognize the legislature's power is almost plenary and may not be questioned by this Court unless the legislature's actions violate the Constitution of West Virginia or the Constitution of the United States. See syl. pt. 3, State ex rel. Lambert v. County *488 Comm'n, 192 W.Va. 448, 452 S.E.2d 906 (1994) (This Court must use every reasonable construction of a legislative enactment in order to sustain its constitutionality). However, no matter how commendable the goals of the Boone County Commission or how great the power of the legislature, this Court is obligated to follow the mandates of the West Virginia Constitution. Id.

A.
Obviously a primary issue raised in this mandamus proceeding is whether the Tax Increment Financing Act creates a debt in violation of W. Va. Const. art. X, § 8.[6] Article X, § 8 of the Constitution of West Virginia limits the amount of debt that may be incurred by a county, city, school district or municipal corporation.[7]
The County Commission, however, maintains that the tax increment obligations issued pursuant to the Tax Increment Financing Act are exempt from the debt restrictions set forth in W. Va. Const. art. X, § 8. More specifically, the County Commission asserts that because the tax increment obligations will be paid out of a special fund, that is, the tax increment financing fund, the debt restrictions in W. Va. Const. art. X, § 8 are inapplicable.
We are mindful that the underlying purpose of constitutional debt restrictions is to protect the fiscal integrity of our governmental entities. See State v. Spelsberg, 191 W.Va. 553, 556, 447 S.E.2d 16, 19 (1994). Thus, the common thread linking the various financing schemes which we have approved of as not implicating our constitutional restrictions on debt is that they do not impair "the financial integrity of the State's existing tax structure[.]" State ex rel. Marockie v. Wagoner, 190 W.Va. 467, 472, 438 S.E.2d 810, 815 (1993).[8]
Generally, this Court has recognized three categories of bonds which do not implicate our constitutional restrictions on debt.[9] The first category of bonds is those issued pursuant to W. Va. Const. art. XIV, § 2, relating to constitutional amendments. We have concluded that those bonds "override the more general bond limit restrictions because they *489 were approved by the voters for the specific purposes contained in the amendment."[10]Winkler, 189 W.Va. at 755, 434 S.E.2d at 427.
The second category of bonds is those which are "payable from lease rental payments or similar contract arrangements for a necessary service on the part of the public agency." Id. at 760, 434 S.E.2d at 432. We have given our approval to this financing arrangement because of the state agencies' "recurring needs for services, such as rental space and utility services.... In such a situation, the lease payments are used to retire revenue bonds that were issued to construct [a] building." Id. at 756, 434 S.E.2d at 428. See, e.g., State ex rel. State Building Comm'n v. Moore, 155 W.Va. 212, 184 S.E.2d 94 (1971). As noted in Winkler, the rationale of the lease-financing arrangement formed the basis for our approval of contract arrangements for a necessary service on the part of a public agency even though the contract was not a lease. Winkler, 189 W.Va. at 756-57, 434 S.E.2d at 428-29. The rationale behind the lease-financing arrangement also formed the basis for "our approval of the issuance of industrial and commercial revenue bonds under ..." the Industrial Development and Commercial Development Bond Act found in W. Va.Code, 13-2C-1, et seq. Id. at 757, 434 S.E.2d at 429. Under this act, "a county acquires land and contracts with a private corporation to lease the land for a rental sufficient to retire the bonds that are issued by the county to secure the funds to build the facility." Id. See, e.g., State ex rel. Ohio County Comm'n v. Samol, 165 W.Va. 714, 275 S.E.2d 2 (1980); State ex rel. County Court of Marion County v. Demus, 148 W.Va. 398, 135 S.E.2d 352 (1964).
The County Commission does not argue that the tax increment obligations fall within the two categories of bonds described above. Instead, as previously indicated, the County Commission relies on a third category of bonds.
The third category of bonds are bonds which are liquidated out of a special fund. Winkler, 189 W.Va. at 757, 434 S.E.2d at 429. We have explained that "[t]his concept is related to the lease-financing arrangement, but differs because the special fund is ordinarily a tax or a fee generated from the facility itself, such as tolls for the use of a bridge or road, or parking-garage fees." Id. The general basis for the special fund concept was expressed in State ex rel. Hall v. Taylor, 154 W.Va. 659, 672, 178 S.E.2d 48, 56 (1970):[11]
It is difficult to state the `separate fund doctrine' precisely. Its application varies somewhat among appellate courts of various states. It is applied uniformly in relation to projects or facilities which are self-liquidating, such as the toll bridge cases. Some courts hold that the doctrine applies *490 in any case of a fund created by a special excise tax as distinguished from property taxes.
See Winkler, 189 W.Va. at 757, 434 S.E.2d at 429. More recently, we stated that "the special fund doctrine is based on the fact that a specific source of revenue is required to be identified and committed to the repayment of the bonds beyond mere annual appropriations from the general revenue fund." Winkler, 189 W.Va. at 758, 434 S.E.2d at 430. The legislature may accomplish this by creating a new tax source or increasing the amount to be paid on an existing tax account. State ex rel. Marockie, 190 W.Va. at 472, 438 S.E.2d at 815. This Court has also used language that the legislature may also "utilize an existing special revenue source to liquidate revenue bonds so long as that source of funds has not gone into the general revenue fund." Id. (footnote omitted).
The special fund concept was the basis of our approval of the funding mechanism utilized in State ex rel. State Building Comm'n v. Moore, 155 W.Va. 212, 184 S.E.2d 94 (1971). In Moore the profits accruing from the sale of alcoholic liquors were dedicated to paying the principal of and interest on the "State Building Revenue Bonds." This Court concluded that the issuance of the revenue bonds did not implicate our constitutional restrictions on debt because the use of a portion of the profits from the sale of alcoholic liquors to pay the principal of and interest on the bonds did not affect the general revenue appropriations or taxes imposed upon the taxpayers. Id. at 234, 184 S.E.2d at 106-107.
Likewise, in State ex rel. State Road Commission v. O'Brien, 140 W.Va. 114, 82 S.E.2d 903 (1954) we found our constitutional restrictions on debt were not implicated when the principal of and interest on bonds used to finance the construction of a bridge were paid from revenue provided by the tolls from the bridge. We emphasized in O'Brien that the reason our constitutional restrictions on debt were not implicated is because neither the general revenue nor any other revenue of the State was committed to fund the bonds. Id. at 126, 82 S.E.2d at 909.
Similarly, in State ex rel. Board of Governors of West Virginia University v. O'Brien, 142 W.Va. 88, 94 S.E.2d 446 (1956) this Court was confronted with the question whether the issuance of revenue bonds in order to fund the construction of new buildings at West Virginia University violated our constitutional restrictions on debt. The principal of and interest on the revenue bonds were to be paid from fees collected by the students at the university and put into a special fund. This Court concluded that the bonds did not implicate our constitutional restrictions on debt because
[t]he promise made is to pay solely out of the special fund to be created, not out of general or property tax revenues but from fees collected from students at the university... No taxes or properties of the State are pledged or in any way made liable for the payment of the bonds. As already made clear, a debt to be paid in such manner does not constitute a debt within the meaning of that constitutional provision [W. Va. Const. art. X, § 4]. That provision, as previously pointed out, was intended to prohibit the creation of debts, by the State, required to be repaid by a public tax.
Id. at 96-97, 94 S.E.2d at 451 (emphasis added).
More recently, we found that the use of monies allocated from the net profits of the West Virginia Lottery to liquidate the School Building Authority's revenue bonds did not implicate the constitutional restrictions on debt because the net profits of the lottery were a new source of revenue that had not been treated as a part of the general revenue of the State. Syl. pt. 3, State ex rel. Marockie v. Wagoner, 191 W.Va. 458, 446 S.E.2d 680 (1994). See also syl. pt. 1, in relevant part, State ex rel. Council of the City of Charleston v. Hall, 190 W.Va. 665, 441 S.E.2d 386 (1994) (We held that W. Va. Const. art. X, § 8 was not implicated by "a contract for a term of twenty-five years whereby a city is obligated to pay a fee for solid waste disposal when that fee comes from a special fund collected by the city for such solid waste disposal.").
*491 In the cases noted above, various financing schemes passed constitutional muster because a new tax source was utilized, the amount to be paid on an existing tax account was increased, or an existing special revenue source was used which had not been placed into the general revenue funds, thus "the financial integrity of the State's existing tax structure ..." had not been impaired. State ex rel. Marockie, 190 W.Va. at 472, 438 S.E.2d at 815. Clearly, the special fund concept has been held not to violate constitutional restrictions on incurring debt only when the general tax revenue of the State or county has not been affected.
In the case before us, the County Commission argues that the increase in the property taxes collected as a result of the increase in the value of the property creates a new source of revenue because those taxes would not exist but for the development project. The County Commission concludes that the issuance of tax increment obligations which are paid from the tax increment financing fund, a special fund, does not create a debt which is subject to the restrictions set forth in W. Va. Const., art. X, § 8. We find this argument to be illusory.
As our discussion above reveals, the critical issue in determining whether our constitutional restrictions on debt are implicated is whether the funds used to pay the principal of and interest on tax increment obligations affect the general revenue of the county. None of the cases discussed above in which this Court held that the use of a special fund did not implicate our constitutional restrictions on debt involved the use of ad valorem taxes to pay the principal of and interest on the bonds.
The ad valorem tax is the most fundamental tax imposed upon the citizens of this State to fund local government, including schools. See State ex rel. Ayers v. Cline, 176 W.Va. 123, 128, 342 S.E.2d 89, 94 (1985) (We noted that property taxes were a principal source of revenue for local governments). Our constitution has established strict parameters governing the implementation and use of the ad valorem tax. For instance, W. Va. Const. art. X, § 1 mandates that all taxes levied on property must be equal and uniform and must not exceed certain maximum rates.[12]See n. 7, supra. W. Va. Const. art. X, § 8 restricts a county's authority to incur a debt that must be paid from the county's share of ad valorem taxes. The very purpose of these two constitutional provisions is to insure the county has sufficient funds to operate government, yet do so in a fiscally sound manner. Thus, it is clear that the tax increment financing fund is not a special fund because it clearly implicates the ad valorem taxing power of the county. Our conclusion is supported by cases from other jurisdictions.[13]
*492 For instance, the Supreme Court of Wisconsin was confronted with deciding whether the tax increment bonds issued by the City of Hartford in order to rehabilitate parts of the city were debt within the meaning of Wisconsin's constitutional debt limitation provision.[14]City of Hartford v. Kirley, 172 Wis.2d 191, 493 N.W.2d 45 (1992). The Supreme Court of Wisconsin concluded that the tax increment bonds were debt:
Even assuming, arguendo, that the tax increments would not have existed but for the district's creation, we conclude that the City's ... [tax increment financing] bonds... constitute debt because they are payable solely from general property tax revenue. This Court has in the past recognized a distinction between the pledging of general tax revenues and the pledging of project revenues.
Id. 493 N.W.2d at 54 (emphasis added). See also City of Tucson v. Corbin, 128 Ariz. 83, 623 P.2d 1239 (App.1980) (Even though the tax increment is placed into a special fund, the use of tax increment bonds creates a debt which is subject to the constitutional debt limitation); Richards v. City of Muscatine, 237 N.W.2d 48 (Iowa 1975) (Tax increment bonds are a debt subject to the constitutional debt limitation even though the bonds are paid from a special fund because the fund is made up of the city's general revenue); Muskogee Urban Renewal Authority v. Excise Board of Muskogee County, 899 P.2d 624 (Okl.1995). But see State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla. 1980).[15]
In arriving at its conclusion, the Supreme Court of Wisconsin focused on the purpose behind the constitutional debt limitation provision:
The very fact that the constitutional debt limit is calculated as a percentage of the taxable property located within a municipality's boundaries shows that the drafters of the constitutional provision were concerned about a municipality's incurring excessive obligations to be paid out of general property tax revenues. To hold that ... [tax increment financing] bonds payable from the general property tax revenues are not debt would permit the City to commit large portions of its general property tax revenues to special funds without regard to the constitutional debt limitation.... Such a holding would virtually nullify the constitutional debt limitation. *493 City of Hartford, 493 N.W.2d at 55-56 (citation omitted). As another court has succinctly stated, by using tax increment financing "a city could divide its general revenues into several special funds, each with a bond issue restricted to recourse against its own fund and thus commit large portions of the city's revenues without regard to ... [the constitutional debt limitation provision]. The constitutional debt limitation could thus be virtually nullified." Richards, 237 N.W.2d at 64.
We share the same concerns as other courts have expressed above. Accordingly, we hold that when tax increment obligations are issued pursuant to W. Va.Code, 7-11B-1, et seq. [1995], The Tax Increment Financing Act, to finance a county development project authorized therein, a debt is created within the meaning of article X, § 8 of the Constitution of West Virginia and such tax increment obligations may only be issued in accordance with article X, § 8.

B.
Because we have concluded that the Tax Increment Financing Act creates a debt within the meaning of W. Va. Const. art. X, § 8, we must determine whether the Tax Increment Financing Act and the proposed tax increment financing plan for the Boone County Development project satisfy the restrictions in W. Va. Const. art. X, § 8. W. Va. Const. art. X, § 8 sets forth three conditions which must be satisfied before a county, city, or municipal corporation may incur debt.[16] First, a county, city or municipal corporation may not incur an indebtedness "in any manner, or for any purpose ..., including existing indebtedness, in ... [an aggregate amount] exceeding five per centum on the value of the taxable property therein to be ascertained by the last assessment for State and county taxes[.]" W. Va. Const. art. X, § 8. Second, the county, city, or municipal corporation to incur debt must provide

for the collection of a direct annual tax on all taxable property therein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article [W. Va. Const. art. X, § 1], separate and apart from and in addition to all other taxes for all other purposes, sufficient to pay, annually, the interest on such debt, and the principal thereof, within, and not exceeding thirty-four years.
Id. (emphasis added). Third, "no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a vote of the people, and have received three fifths of all the votes cast for and against the same." Id.
The County Commission maintains that even if the tax increment obligations are debt *494 the Tax Increment Financing Act meets all of the conditions set forth in W. Va. Const. art. X, § 8. More specifically, the County Commission asserts that the first condition relating to debt not exceeding five percent of the taxable property ascertained by the last assessment is satisfied because Boone County currently has no general obligation bonded indebtedness outstanding. If the County Commission's assertion is true, which we will assume for purposes of this opinion, then the County Commission is correct in asserting that the first condition set forth in W. Va. Const. art. X, § 8 has been met.
Although the County Commission's argument is unclear, it asserts that the second condition set forth in W. Va. Const. art. X, § 8 is "not implicated here, since the commitment of tax revenues is limited to the amount derived from existing regular levies applied to the additional assessed values resulting from the private project." (citing W. Va. Code, 7-11B-4(a)(4), footnote omitted and emphasis added). The County Commission's assertion ignores the clear language of the constitution. As noted above, W. Va. Const. art. X, § 8 explicitly states that a county, city, or municipal corporation may not incur a debt unless it provides "for the collection of a direct annual tax on all taxable property therein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article [W. Va. Const. art. X, § 1], separate and apart from and in addition to all other taxes for all other purposes "in order to pay off the debt. (emphasis added). The above language indicates that if a county increases its current debt or creates a new debt, it must also adjust its taxes accordingly in order to pay the principal of and interest on such debt. Generally, this is accomplished by adjusting the county's levy rate. However, as is explicit in W. Va. Const. art. X, § 8, if the levy rate is adjusted, the new rate must not exceed the maximum rate established in W. Va. Const. art. X, § 1. See also W. Va.Code, 11-8-6b [1953] (Sets the maximum levies a county commission may assess on each classification of property).
As previously explained, the Tax Increment Financing Act provides that ad valorem taxes collected as a result of the increase in the property value of the private project property are to be used to pay the principal of and interest on the tax increment obligation. Using revenue generated from the increased valuation of the private project property, however, does not satisfy the constitutional requirement that a "direct annual tax on all taxable property ... separate and apart from and in addition to all other taxes for all other purposes" be assessed to pay the principal of and interest on the increased or new debt. Instead, using revenue generated from the increased valuation of the private project property is using an existing tax to pay the principal of and interest on the increased or new debt. Therefore, the very fact the Tax Increment Financing Act commits tax revenues which are "derived from existing regular levies applied to the additional assessed values resulting from the private project" makes the act unconstitutional.[17]
Accordingly, we hold that the issuance of tax increment obligations pursuant to W. Va.Code, 7-11B-1, et seq. [1995], The Tax Increment Financing Act, is not in accordance with W. Va. Const. art. X, § 8 because W. Va.Code, 7-11B-1, et seq. [1995] does not provide "for the collection of a direct annual tax on all taxable property therein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article [W. Va. Const. art. X, § 1], separate and apart from and in addition to all other taxes for all other purposes" in order to pay the principal of and interest on such tax increment obligations and is, therefore, unconstitutional. We need not address the other issues raised by the Clerk since the Tax Increment Financing Act does not survive this initial constitutional barrier.

*495 III.
In conclusion, this Court held the following in syllabus point 2 of State ex rel. Kucera v. City of Wheeling, 153 W.Va. 538, 170 S.E.2d 367 (1969): "A writ of mandamus will not issue unless three elements coexist (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." In the case before us, the County Commission has failed to meet the first of the three elements necessary for the issuance of a writ of mandamus. As we explained above, the Tax Increment Financing Act violates W. Va. Const. art. X, § 8. Thus, the County Commission does not have a legal right to continue the process outlined under the act in order to fund the county project. We, therefore, decline to issue a writ of mandamus.
Writ denied.
NOTES
[1] W.Va.Code, 7-11B-3(j) [1995] defines tax increment obligation as follows: "`Tax increment obligation' means any bond or note issued by a county commission in accordance with section six [§ 7-11B-6] of this article."
[2] W. Va.Code, 7-11B-3(b) [1995] defines base assessed value as follows:

`Base assessed value' means the taxable assessed value of real and tangible personal property of a project developer within a development project area as shown upon the land book and personal property records of the assessor on the first day of July of the year preceding the effective date of the order authorizing the tax increment financing plan.
[3] W. Va.Code, 7-11B-3(k) [1995] defines tax increment financing plan as follows:

`Tax increment financing plan' means a plan proposed by either an agency or a project developer requesting that a specific development project be developed in conjunction with a private project of such project developer, which plan is approved by the county commission for the county in which the development project area is located in accordance with the procedures set forth in section four [§ 7-11B-4] of this article.
[4] W. Va.Code, 7-11B-6(a) [1995] cross-references several sections of chapter 13, article 2C of the W. Va.Code, known as the Industrial Development and Commercial Development Bond Act, stating that the tax increment obligations "shall be issued and the payment of such ... [tax increment obligations] secured in the manner provided by the applicable provisions [in W. Va. Code, 13-2C-7 to 13-2C-15 and W. Va.Code, 13-2C-17, 13-2C-19, and 13-2C-20.]" In particular, W. Va.Code, 13-2C-7 [1975] states, in relevant part, that "[t]he bonds and interest coupons issued under the authority of this article shall never constitute an indebtedness of the county, or of the municipality issuing the same, within the meaning of any constitutional provision or statutory limitation[.]" However, we have stated that "[a] mere legislative declaration that a state debt is not created by the statute is not conclusive or binding upon a court. Whether a state debt is created by the statute is a judicial question, rather than a legislative question." State ex rel. Hall v. Taylor, 154 W.Va. 659, 674, 178 S.E.2d 48, 57 (1970) (citations omitted), overruled on other grounds, State ex rel. West Virginia Resource RecoverySolid Waste Disposal Authority v. Gill, 174 W.Va. 109, 323 S.E.2d 590 (1984). See n. 11, infra.
[5] By assuring that the State receives its allocated share of the ad valorem taxes assessed, the legislature implicitly recognized that W. Va. Const. art. X, § 6 prohibits the State from granting its credit to a county:

The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever.
[6] The Clerk argues that the Tax Increment Financing Act creates an unconstitutional debt of the State pursuant to W. Va. Const. art. X, § 4. Although §§ 4 and 8 of article X of our constitution have similar underlying objectives of limiting the power to incur debt and defining the circumstances of when debt is acceptable, they are not the same. See State v. Spelsberg, 191 W.Va. 553, 556 n. 6, 447 S.E.2d 16, 19 n. 6 (1994). W. Va. Const. art. X, § 4 deals with restrictions on the bonded indebtedness of the State, whereas W. Va. Const. art. X, § 8 concerns the restrictions on the bonded indebtedness of counties, cities, school districts and municipal corporations. Id. In that the Tax Increment Financing Act gives county commissions the authority to implement a tax increment financing plan, W. Va. Const. art. X, § 8 is the applicable constitutional provision in the case before us.
[7] W. Va. Const. art. X, § 1, known as the Tax Limitation Amendment, also limits the authority of counties to incur debt. See State ex rel. County Court v. Partlow, 130 W.Va. 777, 783, 45 S.E.2d 506, 509 (1947). More specifically, W. Va. Const. art. X, § 1, among other things, establishes maximum rates at which each class of property may be taxed. See Killen v. Logan County Comm'n, 170 W.Va. 602, 295 S.E.2d 689 (1982) (Provides a cogent discussion on W. Va. Const. art. X, § 1 and on the legislature's enactment of W. Va.Code, 11-8-1, et seq. to implement W. Va. Const. art. X, § 1). In that the Tax Increment Financing Act does not change the rates at which each class of property is taxed, the act does not directly implicate W. Va. Const. art. X, § 1. However, as we will explain later in this opinion, W. Va. Const. art. X, § 8 implicates W. Va. Const. art. X, § 1. See section II, B, infra.
[8] We will not attempt to determine whether the tax increment obligation is a general obligation bond or revenue bond because those terms are not used in our constitutional provisions limiting debt. See Winkler v. School Building Authority, 189 W.Va. 748, 766 n. 28, 434 S.E.2d 420, 438 n. 28 (1993). The County Commission refers to the obligation as a bond. The label of the bond is unimportant. Instead, the critical issue is whether the issuance of the obligations will affect the financial integrity of our existing tax structure. Id.
[9] Many of the cases cited in our discussion of what is a debt that is subject to our constitutional restrictions on debt relate to W. Va. Const., art. X, § 4. Although, as we have previously explained, article X, § 4 is not at issue, because the underlying purpose of §§ 4 and 8 in article X is the same, we find our discussion of what is a debt which is subject to the restrictions set forth in § 4 to be useful in determining what is a debt subject to the restrictions expressed in § 8. See n. 6 supra.
[10] Winkler provides a list of the amendments to the Constitution of West Virginia that have authorized the issuance of the bonds along with the year they were ratified. Winkler, 189 W.Va. at 754-55 n. 10, 434 S.E.2d at 426-27 n. 10.
[11] State ex rel. Hall, supra, was overruled by State ex rel. West Virginia Resource Recovery-Solid Waste Disposal Authority v. Gill, 174 W.Va. 109, 323 S.E.2d 590 (1984); however, as will be explained below, it does not affect the principle we quoted above from Hall. In syllabus point 2 of Gill, supra, this Court held:

State ex rel. Hall v. Taylor, 154 W.Va. 659, 178 S.E.2d 48 (1970), is hereby overruled insofar as it finds any agreement whereby bonds of a state agency are to be discharged from a fund created in whole or in part by legislative appropriations of the general revenue funds of the State to be unconstitutional.
As we explained in Winkler,
[t]he obvious import of Gill was to loosen the rather harsh restrictions created in State ex rel. Hall v. Taylor, supra, as to the use of lease contracts to finance the retirement of revenue bonds.... [In Hall ] [w]e concluded that because the agencies were funded by general revenue appropriations from the Legislature, that the Legislature would thus be required to pay the agencies' rents from such funds. [We held in Hall that] [t]his arrangement would create a state debt in violation of Section 4 of Article X of our Constitution.
Winkler, 189 W.Va. at 759, 434 S.E.2d at 431. In Winkler we overruled Gill, supra, to the extent it implied that the payment of the principal of and interest on bonds could come from the general revenue of the State without creating a debt within the meaning of W. Va. Const. art. X, § 4 as long as the bonds stated that successive legislatures are not obligated to make an appropriation to pay the principal of and interest on such bonds. See syl. pt. 7, Winkler, supra. See also Winkler, 189 W.Va. at 759, 434 S.E.2d at 430-31.
[12] There are two basic components of taxation: valuation and levying. Killen v. Logan County Comm'n, 170 W.Va. 602, 607, 295 S.E.2d 689, 694 (1982). This Court, in Killen, provided a good summary of how the two basic components affect taxation:

Valuation is the act of placing a value on each piece of property. This phase of the process is sometimes referred to as assessment.... Levying is the establishment and application of a rate of taxation upon the valuation of property, the result being the determination of the amount of the tax owed.... In property taxation, the levy rate is the total amount set by the various levying bodies: the state, county commissions, local school boards, and municipalities.
Id. at 607-08, 295 S.E.2d at 694-95 (citations and footnotes omitted).
The levy rate, however, must not exceed the maximum rate established in W. Va. Const. art. X, § 1. Once the levy rate has been determined pursuant to W. Va. Const. art. X, § 1, each of the levying bodies receives an allocated share of the taxes collected pursuant to that levy rate. To accomplish this goal the legislature has statutorily set maximum levy rates which may be laid by each of the taxing units in W. Va.Code, 11-8-1, et seq. See W. Va.Code, 11-8-3 [1933]. See also Killen, 170 W.Va. at 606, 295 S.E.2d at 693. (Pursuant to W. Va. Const. art X, § 1 the legislature is to prescribe a system by which property is valued). The levy rates the legislature statutorily allows each of the levying bodies to lay collectively may not exceed the levy rate established by W. Va. Const. art. X, § 1. Thus, the County Commission is not the only levying body that receives a portion of the property taxes assessed.
[13] Our conclusion is also supported by the statutes governing ad valorem taxation. See W. Va. Code, 11-8-1, et seq. For instance, W. Va.Code, 11-8-10a [1961] implements W. Va. Const. art. X, § 1 by providing that a county commission must first levy for its bonded debt and only after doing so may it then levy for the general current expenses of the county. As we have previously noted, the Tax Increment Financing Act provides that when the tax increment is insufficient to pay the principal of and interest on tax increment obligations, then the tax increment obligations "shall be payable out of revenues derived from the lease, lease with an option by the lessee to purchase, [or] sale ..." of the county project to the private project developer. W. Va.Code, 7-11B-6(a) [1995]. We question whether this provision protects the fiscal integrity of a county.

For example, if the tax increment is insufficient to pay the principal of and interest on tax increment obligations and if a private project developer is financially unable to buy or lease the county's project development, then the county would be forced to pay the principal of and interest on the tax increment obligations from funds intended to pay for its general current expenses. Obviously, in this scenario the fiscal integrity of the county's existing tax structure would be impaired.
[14] Wisconsin's constitutional debt limitation provision is found in article XI, section 3 of the Constitution of Wisconsin and is similar to our constitutional debt limitation provisions.
[15] The County Commission relies on cases from other jurisdictions to support its conclusion that the tax increment bonds do not create a debt within the meaning of W. Va. Const. art. X, § 8. We find the County Commission's reliance on the following cases to be misplaced.

For instance, in South Bend Public Transportation Corp. v. City of South Bend, 428 N.E.2d 217 (Ind.1981) and Tribe v. Salt Lake City Corporation, 540 P.2d 499 (Utah 1975), the respective courts determined that the governmental entities involved were not subject to the constitutional debt limitation provisions. Additionally, in Wolper v. City Council of the City of Charleston, 287 S.C. 209, 336 S.E.2d 871 (1985) the Supreme Court of South Carolina noted that the South Carolina constitution explicitly authorized the issuance of tax increment bonds which were liquidated by ad valorem taxes. See also City of Hartford, 493 N.W.2d at 55 n. 18 (Lists the cases such as those above and explains how they are distinguishable from the line of cases which hold that the use of tax increment bonds creates a debt which is subject to a state's constitutional debt limits). We conclude, as did the Supreme Court of Wisconsin in City of Hartford, that the weight of relevant authority supports our position of finding the use of tax increment bonds which are liquidated by the tax increment to be subject to our state constitutional limits on debt. City of Hartford, 493 N.W.2d at 55, n. 18.
[16] W. Va. Const. art. X, § 8 states in full:

No county, city, school district, or municipal corporation, except in cases where such corporations have already authorized their bonds to be issued, shall hereafter be allowed to become indebted, in any manner, or for any purpose to an amount, including existing indebtedness, in the aggregate, exceeding five per centum on the value of the taxable property therein to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness; nor without, at the same time, providing for the collection of a direct annual tax on all taxable property therein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article, separate and apart from and in addition to all other taxes for all other purposes, sufficient to pay, annually, the interest on such debt, and the principal thereof, within, and not exceeding thirty-four years. Such tax, in an amount sufficient to pay the interest and principal on bonds issued by any school district not exceeding in the aggregate three per centum of such assessed value, may be levied outside the limits fixed by section one of this article: Provided, that no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a vote of the people, and have received three fifths of all the votes cast for and against the same.
Additionally, we note that W. Va. Const. art. X, § 7 states:
County authorities shall never assess taxes, in any one year, the aggregate of which shall exceed ninety-five cents per one hundred dollars valuation, except for the support of free schools; payment of indebtedness existing at the time of the adoption of this Constitution; and for the payment of any indebtedness with the interest thereon, created under the succeeding section, unless such assessment, with all questions involving the increase of such aggregate, shall have been submitted to the vote of the people of the county, and have received three fifths of all the votes cast for and against it.
[17] We note that the Tax Increment Financing Act satisfies the third condition in W. Va. Const. art. X, § 8 that must be satisfied before debt is incurred by requiring that a tax increment financing plan be submitted to the voters and receive an approving vote of three-fifths of the participating voters before it is implemented. See W. Va. Code, 7-11B-6(b) [1995].